UNITED STATES of America, Plaintiff,

v.

STATE OF HAWAII; George R. Ariyoshi, Governor of Hawaii; Franklin Sunn, Director, Hawaii Department of Social Services and Housing; Michael Kakesako, Administrator, Corrections Division, Hawaii Department of Social Services and Housing; William Oku, Administrator, Halawa High Security Facility; and Edwin Shimoda, Administrator, Oahu Community Correctional Center, Defendants.

Civ. No. 83–0248.

United States District Court, D. Hawaii.

May 10, 1983.

---

Wm. Bradford Reynolds, Asst. Atty. Gen., Civ. Rights Div., William French Smith, Atty. Gen. of U.S., Steven B. Berlin, Terisa E. Chaw, Trial Attys., U.S. Dept. of Justice, Civ. Rights Div., Washington, D.C., R. Michael Burke, Asst. U.S. Atty., Daniel A. Bent, U.S. Atty., Honolulu, Hawaii, for plaintiff.

James H. Dannenberg, Deputy Atty. Gen., Tany S. Hong, Atty. Gen., State of Hawaii, Honolulu, for defendants.

J. Kirk Brown, Asst. Atty. Gen., Lincoln, Neb., Michael J. Moquin, Asst. Atty. Gen., Lansing, Mich., for amicus curiae.

Before KING, Chief Judge, FONG, District Judge, and PENCE, Senior District Judge.

## DECISION AND ORDER

SAMUEL P. KING, Chief Judge.

### BACKGROUND

On March 4, 1983, the United States filed suit against the State of Hawaii, pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997 et seq. (Supp. IV 1980), alleging that the conditions in two state prisons violate the federal constitutional rights of the persons confined therein. Defendant State of Hawaii has filed a motion to dismiss on the grounds that the United States has failed to satisfy the statutory prerequisites to filing suit.

Under section 1997b the United States must comply with several certification requirements prior to filing suit. The specific certification requirements at issue in this case are found in subsection 1997b(a), which provides in relevant part as follows:

At the time of the commencement of an action under section 1997 of this title the Attorney General shall certify to the court—

(1) that at least 49 calendar days previously he has notified in writing the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution of—

(A) the alleged conditions which deprive rights, privileges, or immunities secured or protected by the Constitution or laws of the United States and the alleged pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities;

(B) the supporting facts giving rise to the alleged conditions and the alleged pattern or practice, including the dates or time period during which the alleged conditions and pattern or practice of resistance occurred; and when feasible, the identity of all persons reasonably suspected of being involved in causing the alleged conditions and pattern or practice at the time of the

certification, and the date on which the alleged conditions and pattern or practice were first brought to the attention of the Attorney General; and

(C) the minimum measures which he believes may remedy the alleged conditions and the alleged pattern or practice of resistance;

(2) that he has notified in writing the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution of his intention to commence an investigation of such institution, [and] that such notice was delivered at least seven days prior to the commencement of such investigation . . . .

42 U.S.C. § 1997b(a). The statute also requires the Attorney General to certify, *inter alia,* that he has consulted with certain state officials between the time when notice of an investigation is given and suit is filed.

On June 10, 1982, pursuant to section 1997b(a)(2), Assistant Attorney General Reynolds sent the State of Hawaii a "Notice of Intent to Commence Investigation of Oahu Community Correctional Center and Halawa High Security Facility".[1] The parties agree that this kind of letter noticing

an investigation and the actual commencement of the investigation typically precede the 49-day notice letter described in section 1997b(a)(1). Moreover, the State concedes that the Attorney General has no obligation to include any allegations or supporting facts in the letter noticing an intent to commence investigation. In the present case the Attorney General gave the State adequate notice of his intent to commence the investigation.

The dispute between the parties concerns the sufficiency of the 49-day notice letter given to the State and the Attorney General's certification to the Court that he has given such notice in accordance with the statutory requirements. The 49-day letter, sent to the State on August 24, 1982, lists twelve allegedly unconstitutional conditions existing in the two prisons that are under investigation.[2] The problem, in essence, is that this letter contains no apparent reference to supporting facts or remedial measures pursuant to subsections 1997b(a)(1)(B) and 1997b(a)(1)(C). Consequently, the State claims that the federal government has not complied with the notification requirements and therefore has no standing to bring suit under section 1997a.

---

1. On July 1, 1982, the Assistant Attorney General sent the State another letter outlining nine types of problems that were being investigated. The letter notes, however, that the United States is not obligated to supply this information under section 1997. Letter from Assistant Attorney General Wm. Bradford Reynolds to James Dannenberg, Deputy Attorney General of the State of Hawaii (July 1, 1982).

2. The letter describes these conditions as follows:

—inadequate staffing (inadequate numbers, inadequate supervision and training, overuse and inappropriate use of force, failure to protect inmates);

—inadequate protection of inmates from harm (inadequate classification procedures and personnel, inadequate weapon and drug detection, inadequate surveillance and security);

—inadequate and unhealthy physical plant (inadequate general sanitation, fire safety, and environmental safety);

—inadequate medical, dental, and mental health care to meet inmates' serious needs (too few staff; inadequate procedures for access; inadequate recordkeeping, facilities,

and equipment; inadequate procedures and equipment for necessary outside referrals and emergency care);

—inadequate provision for physical exercise and diversion from idleness (inadequate educational, vocational, recreational, and avocational programs and facilities);

—discrimination in housing, programs, and privileges solely on the basis of race, sex, national origin, or handicap;

—inadequate sanitation and nutritional content in food service;

—inadequate provision of personal hygiene needs and clothing;

—inadequate practices to assure inmates' due process rights in disciplinary matters;

—inadequate provision for constitutionally mandated access to attorneys, courts, and governmental officials and agencies;

—inadequate provision for minimally necessary visitation; and

—severe overcrowding.

Letter from Assistant Attorney General Wm. Bradford Reynolds to Governor George R. Ariyoshi (Aug. 24, 1982).

In response, the United States does not really assert that it has notified the State of any supporting facts or remedial measures connected with the allegedly unconstitutional conditions. Rather, the United States contends that the Attorney General's certification to the Court is sufficient on its face and that the Court cannot look behind the certificate to determine whether the United States has complied with the specific notification requirements of section 1997b. Furthermore, the federal government justifies its refusal to provide supporting facts and to recommend remedial measures on the ground that the State has not permitted federal investigators to inspect the two State prisons in question. In sum, the State is denying the federal government access to its prisons until supporting facts and remedial measures have been provided, and the federal government is refusing to provide such information until the State has opened the doors of its prisons to federal investigators.

The Attorney General's certificate is a carefully worded document which does not actually assert that the Justice Department has fully complied with the requirements of section 1997b. The Attorney General first certifies that he has reasonable cause to believe that persons confined in the two State prisons are subject to egregious or flagrant conditions. He then makes the following statement:

> I further certify that, to the fullest extent possible under the particular circumstances of this case, including the State's refusal to allow the Department of Justice to conduct an investigation of the subject institutions, and fully consistent with the intentions of the Congress, at least 49 calendar days prior to the filing

of this Complaint, I have complied with the requirements of 42 U.S.C. § 1997b(a)(1).

Certificate of the Attorney General, William French Smith (Feb. 22, 1983) (attached to Complaint as Exhibit A).

## DISCUSSION

The United States' standing to sue in this case raises three questions. The first question concerns the extent to which this Court can review the Attorney General's certificate and, more generally, the Attorney General's compliance with the notification requirements of subsection 1997b(a)(1). The second question is whether the Attorney General has in fact complied with the certification requirements of subsection 1997b(a). Finally, if the Attorney General has failed to comply, the Court must determine the effect of that noncompliance or, more precisely, whether the noncompliance is justified under the circumstances of this case.

With respect to the first question, there is no doubt that this Court can review the Attorney General's certificate on its face to determine whether it meets the minimum statutory requirements. The statute requires the Attorney General to certify, *inter alia*, that he has notified State officials pursuant to subsection 1997b(a)(1) of the alleged unconstitutional conditions, the supporting facts giving rise to those conditions, and the minimum measures for remedying those conditions. The Attorney General's certificate, however, only asserts that the federal government has complied with subsection 1997b(a)(1) "to the fullest extent possible". By itself, this ambiguous phraseology would not necessarily impugn the validity of the certificate as a whole.[3] At the

---

**3.** This point can be illustrated by reference to the Attorney General's certification that he had given proper notification to State officials of his intent to commence an investigation pursuant to subsection 1997b(a)(2). In his certificate the Attorney General makes the following statement: "I certify that, to the fullest extent possible, given the State's refusal to allow a Justice Department investigation, I have complied with the requirements of 42 U.S.C. § 1997b(a)(2)." Certificate of the Attorney

General, William French Smith. Hypothetically, the State might have challenged the federal government's standing to file suit on the ground that the Attorney General's language certifying compliance with subsection 1997b(a)(2) was not sufficiently definite. However, if the federal government actually had complied fully with subsection 1997b(a)(2), as it did in the present case, the Court probably would not dismiss the suit for lack of proper certification.

very least, however, it immediately raises questions about whether the Attorney General has given proper notice to State officials.

By analogy to various civil rights statutes and the cases interpreting those statutes, the United States argues that this Court cannot look beyond the face of the Attorney General's certificate in any manner whatsoever in order to determine whether the Attorney General actually has complied with the notification requirements of subsection 1997b(a)(1). This argument, however, misconstrues the limitations on judicial review of the Attorney General's certification under section 1997b. These other civil rights statutes cited by the United States contain certification requirements that differ markedly from those of section 1997b. In contrast to the detailed and extensive directives found in section 1997b, these statutes typically permit the Attorney General to initiate an action merely upon certification that he has reasonable cause to believe that persons are engaged in unlawful practices. *See, e.g.,* Title IV of the Civil Rights Act of 1964, 42 U.S.C. § 2000c–6 (1976) (Attorney General can initiate action upon belief that complaint is meritorious and after certifying that complainants are unable to maintain appropriate legal proceedings); Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6 (1976) (Attorney General can bring civil action upon reasonable cause to believe that persons are engaged in unlawful practice); Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3613 (1976) (same).[4]

■ In enacting CRIPA Congress considered the certification requirements in other statutes and the extent to which the Attorney General's certification under section 1997b is nonreviewable. The House Conference Report specifically states: "As with certification requirements in other statutes, the facts and judgments contained in the certification under [section 1997b] are not judicially reviewable and shall not be a matter of litigation in any way." H.Conf. Rep. No. 897, 96th Cong., 2d Sess. 14, *reprinted in* 1980 U.S.Code Cong. & Ad.News 787, 838; *see also* H.R.Rep. 80, 96th Cong., 1st Sess. 22 n. 49 (1979) (citing civil rights statutes and cases interpreting these statutes). The clear meaning of this legislative history is that courts should not review the substance of the information noticed pursuant to subsection 1997b(a)(1). For example, courts should not review such questions as whether the allegations are justified, whether the facts actually support the allegations, or whether the proposed remedial measures are appropriate.[5] This limitation on judicial review, however, should not prevent an examination of whether the Attorney General has fulfilled his basic statutory obligation to notify the State of some allegations, some facts, and some remedial measures.

In brief, the first question before this Court does not concern the substance of the allegations, facts, and remedial measures contained in the Attorney General's 49–day notice letter. Rather, the question is whether the letter conceivably could be construed as containing any of this information. Consequently, the Court concludes that the Attorney General's compliance with section 1997b is reviewable for the limited purpose of determining whether the

---

4. Courts interpreting these statutes have concluded that it would be inappropriate to review the basis for the Attorney General's certification or for his belief that reasonable cause exists to bring suit. *See, e.g., United States v. Bob Lawrence Realty, Inc.,* 474 F.2d 115, 125 n. 14 (5th Cir.) (interpreting Title VIII), *cert. denied,* 414 U.S. 826 (1973); *United States v. International Association of Bridge, Structural, and Ornamental Iron Workers, Local No. 1,* 438 F.2d 679, 681 & n. 3 (7th Cir.) (interpreting Title VII), *cert. denied,* 404 U.S. 830, 92 S.Ct. 75, 30 L.Ed.2d 60 (1971).

5. The legislative history quoted above refers to "facts and judgments *contained* in the certification". H.Conf.Rep. No. 897, 96th Cong., 2d Sess. 14 (emphasis added), U.S.Code Cong. & Admin.News 1980, p. 838. This assumes that the Attorney General's certification actually includes the information supplied to a state pursuant to subsection 1997b(a)(1). According to this view, a court would not need to "look behind" the Attorney General's certification order to determine whether a state had received proper notification.

State has received any notification whatsoever of alleged unconstitutional conditions, supporting facts, and recommended remedial measures.

■ The second question in this case is whether the United States has in fact complied with section 1997b. The Attorney General certainly has provided the State with an ample list of the alleged conditions depriving inmates of their rights. Despite some suggestion to the contrary, however, it is clear that the State has not received notification of any facts supporting these allegations.[6] There has never even been a suggestion that the United States has notified the State of any remedial measures. The Court therefore finds that the Attorney General's certification does not comply with the requirements of section 1997b.

■ The final question presented is whether the Attorney General's noncompliance with section 1997b deprives the United States of standing to bring suit. The United States contends that its noncompliance is justified, apparently for two reasons. First, as suggested by the language of the Attorney General's certificate, the United States maintains that it *cannot* provide more information to the State because it has already complied with section 1997b to the fullest extent possible in light of the State's refusal to allow an inspection of the two prisons. Second, the United States seems to maintain that it *should not* be required to comply with all the statutory notification requirements, again because of the State's refusal to allow an inspection of the prisons.

The essence of the first argument is that the United States simply does not possess the necessary supporting facts and cannot propose remedial measures until it has conducted an inspection of the prisons. This argument ignores the close connection that exists between allegations and supporting facts. To the extent that the Attorney General can make allegations, he possesses

or ought to possess certain information that would constitute supporting facts under subsection 1997b(a)(1)(B). Likewise, he would be able to propose corrective measures that would suffice for purposes of subsection 1997b(a)(1)(C). The Justice Department's own guidelines for initiating an investigation confirm that the Attorney General has access to supporting facts long before state officials are given formal notification forty-nine days prior to the commencement of litigation. The guidelines require that an "investigation memorandum" be prepared before the Justice Department even commences an investigation, and that this memorandum review the complaint and "describe the independent verification and corroboration obtained". Report of the Attorney General to Congress Regarding Activities Initiated Pursuant to the Civil Rights of Institutionalized Persons Act, at 3 (Feb. 22, 1982). To the extent that the Justice Department can verify or corroborate a complaint, the Attorney General can provide state officials with facts supporting his allegations.

■ The federal government's second argument, that strict compliance with section 1997b *should not* be required because the State has refused to cooperate, is equally flawed. The Court does not question the assertion in the Attorney General's certificate that the State has failed to cooperate fully in the Justice Department's investigation. As for the extent of cooperation expected of states, the Conference Report leaves no doubt about the congressional intent underlying CRIPA:

Congress recognizes that before initiating litigation with respect to a particular institution, the Attorney General must, of course, thoroughly investigate such institution. It is anticipated that the States and relevant officials will cooperate in the investigative process. If there is a failure to do so, the Attorney General may consider this factor in taking any actions under this Act.

---

6. At one point during oral argument counsel for the United States suggested that the list of alleged conditions contained factual material. Upon further questioning, however, counsel admitted that the supporting facts which the Justice Department actually possesses have not been given to the State.

H.Conf.Rep. No. 897, 96th Cong., 2d Sess. 12, *reprinted in* 1980 U.S.Code Cong. & Ad. News 836. Notwithstanding expectations about states' cooperativeness, however, it is clear that Congress did not give federal investigators the power to enter a state prison without the consent of the state. Up until the moment when discovery commences during the course of litigation, a state lawfully can force the Justice Department to conduct its investigation through means other than an inspection of the premises. A state's failure to cooperate therefore cannot justify the federal government's failure to comply with its statutory obligations.[7]

The Justice Department generally can satisfy the requirements of section 1997b without actually inspecting the state's prisons. Thus, a state's failure to cooperate probably will force the Attorney General to file suit based on scant or inaccurate information.[8] Such a result is hardly consistent with CRIPA's emphasis on discussion and consultation between state and federal officials. *See* 42 U.S.C. § 1997b(a)(2). Of course, these considerations do not concern the merits of this case.

Accordingly, IT IS HEREBY ORDERED that the State of Hawaii's Motion to Dismiss is GRANTED on the ground that the United States has failed to satisfy the statutory requirements for standing to bring this action.[9]

---

7. As noted in the Conference Report, a state's failure to cooperate is a factor that the Justice Department may consider in taking any actions under the statute. Naturally, federal officials might be encouraged to take actions specifically *permitted* by the statute, such as issuing a 49–day notice letter or filing suit; they cannot be excused, however, from performing acts specifically *required* by the statute.

8. Congress was well aware that the Attorney General, upon giving notification to a state pursuant to subsection 1997b(a)(1), might not have access to the best possible information. The House Conference Report comments on this problem in the context of the Attorney Gener-

al's duty to inform the state of remedial measures: "Congress realizes that before a complaint is filed and discovery conducted, it may be impossible for the Attorney General to specify the precise measures required to correct the alleged abuses." H.Conf.Rep. No. 897, 96th Cong., 2d Sess. 13, *reprinted in* 1980 U.S.Code Cong. & Ad.News 837.

9. This case originally was assigned to Chief Judge Samuel P. King. On March 8, 1983, Judge King issued an order that the case would be heard en banc before himself, District Judge Harold M. Fong, and Senior District Judge Martin Pence, with Judge King presiding.