UNITED STATES of America, Plaintiff,

v.

STATE OF MICHIGAN; John Engler, in his official capacity as the Governor of the State of Michigan; Michigan Department of Corrections; Kenneth L. McGinnis, in his official capacity as Director of the Michigan Department of Corrections; Carol Howes, in her official capacity as warden of Crane Correctional Facility; and Jane Yukins, in her official capacity as warden of Scott Correctional Facility, Defendants.

No. 1:94–CV–510.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 5, 1994.

*seq,* and was intended to determine whether prisoners' federal constitutional rights were being violated at these facilities. The notification cited "allegations that inmates confined at CCF and SCF are being subjected to unsafe and life-threatening living conditions as a result of sexual assaults, lack of protection from harm, inadequate medical care, including mental health care, and inadequate due process."

Shortly thereafter, DOJ notified the State that attorneys from DOJ would be accompanied on the proposed "tour" of the target institutions by a medical doctor, psychiatrist, psychologist and an agent of the FBI trained in photography. DOJ also requested that documents described on a two and one-half page list, attached as Appendix A, be provided for each institution, before the proposed tour, for both review and retention by DOJ.

On June 30, 1994, the State requested a meeting with the DOJ before the investigation of the facilities. That meeting never occurred and, after several exchanges of letters and phone calls between DOJ and the State, the parties' positions became firm and clear: DOJ asserting its right to a full and unrestricted on-site investigation of the facilities, allegedly authorized by CRIPA; and the State's denial of access to the facilities until DOJ provided it with specific allegations of the alleged constitutional violations which are the subject of this proposed investigation.

Michael H. Detmers, U.S. Atty., Grand Rapids, MI and Shanetta Y. Brown, Asst. U.S. Atty., U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, for plaintiff.

Frank J. Kelley, Atty. Gen., David G. Edick, Asst. Atty. Gen., Corrections Div., Lansing, MI, for defendants.

## MEMORANDUM OPINION

McKEAGUE, District Judge.

### PROCEDURAL HISTORY

On June 9, 1994, the Civil Rights Division of the U.S. Department of Justice (DOJ), notified the State of Michigan of DOJ's intention to investigate conditions at the Crane Correctional Facility (CCF) in Coldwater, Michigan, and the Scott Correctional Facility (SCF) in Plymouth, Michigan. DOJ claimed that the investigation was authorized and would be conducted pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA" or the "Act"), 42 U.S.C. § 1997 *et*

On July 28, 1994, DOJ filed its complaint for injunctive relief alleging that DOJ is "entitled to unrestricted access to facilities, records, and persons necessary for it to conduct and complete investigations under CRIPA." The complaint requested this Court to (1) enjoin the State from denying or obstructing the access of attorneys, employees or agents of DOJ to the target institutions, their inmates, records or facility staff, and (2) order the State to provide access to the target institutions, and their inmates, records and facility staff, including but not limited to a broad array of inmate records and access to private and confidential inmate interviews. The complaint was accompanied by the filing of motions for a temporary restraining order and permanent injunctive relief. The motion

for a temporary restraining order was assigned to Honorable Gordon J. Quist and was denied on July 29, 1994. Judge Quist ruled that the purpose of a temporary restraining order is to maintain the status quo in an emergency situation, but that the plaintiff was asking the Court to order an affirmative act, that the plaintiff admitted it did not know if abuse was occurring at either facility, and that the sole reason given to establish the emergency nature of the situation was the schedule of a physician plaintiff wanted to be part of the investigation team. Judge Quist also noted that the allegations of possible wrongdoing were vague and conclusory and that "[a]rguably, to simply order right of entry without any specific showing of abuse ignores all of the statutory safeguards and sensitivity for state interests that [CRIPA] has created."

No action has been initiated by the Attorney General under CRIPA, and the Attorney General concedes that "[t]he United States has no authority to seek a remedy at law under CRIPA...." (Complaint, ¶ 24).

Now before this Court is plaintiff's motion for preliminary injunction (docket # 3), which repeats the requests in its prior motion for temporary restraining order. The Court has fully considered the parties' briefs and oral arguments heard on August 24, 1994.

## ANALYSIS

### Introduction

In general, plaintiff argues that defendants' denial of unrestricted access to CCF and SCF and their records, personnel and inmates has frustrated the U.S. Attorney General's responsibilities under CRIPA. The basis for plaintiff's alleged right of access is plaintiff's claim that the statute implicitly authorizes an unrestricted on-site investigation prior to the initiation of a civil action, and that the legislative history of CRIPA establishes that such investigation was specifically contemplated by Congress. Plaintiff also claims defendants' refusal of the access sought is a violation of the Supremacy Clause of the United States Constitution, art. VI, cl. 2. Finally, plaintiff argues that the State's demand that it be provided with the specific facts which provide the grounds for the proposed investigation before the State will permit access is improper because the statute requires the plaintiff to notify the State of supporting facts giving rise to an alleged constitutional violation only as a condition of instituting litigation.

### Preliminary Injunction Standard

When ruling on a motion for preliminary injunction, "the court must make a decision based upon 'incomplete factual findings and legal research.'" *Michigan Coalition v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991). It is axiomatic, therefore, that "[t]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981). "The obverse of this standard is that the court may not 'alter the prior status of the parties fundamentally.'" *Corbin v. Texaco, Inc.,* 690 F.2d 104, 105 (6th Cir.1982). It cannot be overemphasized that the purpose of a preliminary injunction is a "limited purpose": maintenance of the status quo. *Camenisch,* 451 U.S. at 395, 101 S.Ct. at 1834.

The decision whether to issue a preliminary injunction lies within the sound discretion of the Court. *CSX Transportation, Inc. v. Tennessee State Bd. of Equalization,* 964 F.2d 548, 553 (6th Cir.1992). An injunction generally should not issue if there is an adequate remedy at law. *Id.* at 551.

Under traditional equitable principles recognized in the Sixth Circuit, the Court must consider four factors in making its decision:

1. Whether the moving party has a substantial probability of success on the merits;

2. Whether irreparable injury will occur if the injunction is not issued;

3. Whether the injunction will have a harmful effect on third parties; and

4. Whether the public interest would be served by the injunction.

*CSX Transportation,* 964 F.2d at 550–51. This Court is required to make specific findings concerning each of these four factors,

unless fewer are dispositive of the issue. Fed.R.Civ.P. 52; *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985). In particular, if the movant fails to establish the first two factors, the Court need not reach the other two factors. *Warner v. Central Trust Co.,* 715 F.2d 1121, 1124 (6th Cir.1983).

"These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Michigan Coalition,* 945 F.2d at 153. "The probability of success that must be shown is inversely proportional to the degree of irreparable injury the plaintiff[ ] will suffer absent an injunction." *Ohio ex rel. Celebrezze v. Nuclear Reg. Comm'n,* 812 F.2d 288, 290 (6th Cir.1987). Thus, a preliminary injunction may be granted with a demonstration of either a high probability of success and some injury or *vice versa. Id.* However, "demonstration of a mere 'possibility' of success on the merits is not sufficient, and renders the test meaningless." *Id.* Furthermore, failure to demonstrate *any* irreparable injury absent the preliminary injunction can likewise be fatal to the motion. See, e.g., *Southern Milk Sales, Inc. v. Martin,* 924 F.2d 98, 103 (6th Cir.1991). Thus, at a minimum, the moving party must show "serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the opposing party, if an injunction is issued." *DeLorean,* 755 F.2d at 1229.

**Probability of Success**

**1. Language of Civil Rights of Institutionalized Persons Act**

▮ The principal question underlying the probability of plaintiff's succeeding on the merits is the scope of the investigation of institutions by the Attorney General authorized by CRIPA. Plaintiff argues the broad investigative powers it asserts are *implicitly* authorized by the statute. Plaintiff claims the unrestricted access it seeks is necessary in order to "conduct the type of complete investigation contemplated by Congress in enacting CRIPA." (Pl.Br. at 11). Consequently, plaintiff argues, defendants' refusal to grant the access sought has "frustrated the Attorney General's responsibilities under CRIPA." (Pl.Br. at 2).

It is a well-established maxim of statutory construction that, absent ambiguity, the plain language of the statute controls. "The starting point in interpreting a statute is its language, for '[i]f the intent of Congress is clear, that is the end of the matter.'" *Good Samaritan Hospital v. Shalala,* 508 U.S. ——, ——, 113 S.Ct. 2151, 2157, 124 L.Ed.2d 368, 378 (1993) (citation omitted).

The relevant sections of CRIPA state:

**§ 1997a. Initiation of civil actions**

(a) Whenever the Attorney General has reasonable cause to believe that any State or political subdivision of a State, official employee, or agent thereof, or other person acting on behalf of a State or political subdivision of a State is subjecting persons residing in or confined to an institution, as defined in section 1997 of this title, to egregious or flagrant conditions which deprive such persons of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States causing such persons to suffer grievous harm, and that such deprivation is pursuant to a pattern or practice of resistance to the full enjoyment of such rights, privileges, or immunities, the Attorney General, for or in the name of the United States, may institute a civil action in any appropriate United States District Court against such party for such equitable relief as may be appropriate to insure the minimum corrective measures necessary to insure the full enjoyment of such rights, privileges or immunities, except that such equitable relief shall be available under this subchapter to persons residing in or confined to an institution as defined in section 1997(1)(B)(ii) of this title only insofar as such persons are subjected to conditions which deprive them of rights, privileges or immunities secured or protected by the Constitution of the United States.

\* \* \* \* \* \*

**Attorney General to personally sign complaint**

(c) Any complaint filed by the Attorney General pursuant to this section shall be personally signed by him.

### § 1997b. Certification requirements; Attorney General to personally sign certification

(a) At the time of the commencement of an action under section 1997a of this title the Attorney General shall certify to the court—

(1) that at least 49 calendar days previously he has notified in writing the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution of—

(A) the alleged conditions which deprive rights, privileges, or immunities secured or protected by the Constitution or laws of the United States and the alleged pattern or practice of resistance to the full enjoyment of such rights privileges, or immunities;

(B) the supporting facts giving rise to the alleged conditions and the alleged pattern or practice, including the dates or time period during which the alleged conditions and pattern or practice of resistance occurred; and when feasible, the identity of all persons reasonably suspected of being involved in causing the alleged conditions and pattern or practice at the time of the certification, and the date on which the alleged conditions and pattern or practice were first brought to the attention of the Attorney General; and

(C) the minimum measures which he believes may remedy the alleged conditions and the alleged pattern or practice of resistance;

(2) that he has notified in writing the Governor or chief executive officer and attorney general or chief legal officer of the appropriate State or political subdivision and the director of the institution of his intention to commence an investigation of such institution, that such notice was delivered at least seven days prior to the commencement of such investigation and that between the time of such notice and the commencement of an action under section 1997a of this title—

(A) he has made a reasonable good faith effort to consult with the Governor or chief executive and attorney general or chief legal officer of the appropriate state or political subdivision and the director of the institution, or their designees, regarding financial, technical, or other which may be available from the United States and which he believes may assist in the correction of such conditions and pattern or practice of resistance;

(B) he has encouraged the appropriate officials to correct the alleged conditions and pattern or practice of resistance through informal methods of conference, conciliation and persuasion, including to the extent feasible, discussion of the possible costs and fiscal impacts of alternative minimum corrective measures, and it is his opinion that reasonable efforts at voluntary correction have not succeeded; and

(C) he is satisfied that the appropriate officials have had a reasonable time to take appropriate action to correct such conditions and pattern or practice, taking into consideration the time required to remodel or make necessary changes in physical facilities or relocate residents, reasonable legal or procedural requirements, the urgency of the need to correct such conditions, and other circumstances involved in correcting such conditions; and

(3) that he believes that such an action by the United States is of general public importance and will materially further the vindication of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

(b) Any certification made by the Attorney General pursuant to this section shall be personally signed by him.

Interestingly enough, plaintiff does not claim that any provision of the statute expressly authorizes the "unbridled" (Pl.Br. at 6) investigative access it seeks. Rather, plaintiff argues such access is an implicit corollary of the Attorney General's authority under CRIPA to initiate actions against a

State or its political subdivisions to protect the rights of institutionalized persons. Indeed, there are only two reference to "an investigation" (or "such investigation") in CRIPA. The first is in § 1997b(a)(2), which relates to the certification requirements imposed on the Attorney General before suit may be commenced under § 1997a. The second is § 1997h, which requires certain notification to other federal agencies at the time an investigation is commenced.[1] Neither of these sections contain any definition of the nature and scope of any investigation by the Attorney General. Clearly, this statutory language does not explicitly authorize the unique and plenary pre-litigation investigative powers asserted by plaintiff. If Congress intended to grant such investigative access, Congress clearly knew how to do so. See, e.g., 42 U.S.C. § 2000e–8(a) (authorizing access by the Commissioner of the E.E.O.C. or her representatives "at all reasonable times" to any person being investigated and to any evidence relevant to the charge under investigation). Given the importance of the constitutional rights CRIPA seeks to protect, Congress' failure to either define "investigation" or to provide the Attorney General with the broad investigative powers she seeks through this lawsuit are fatal to her claim.

It is equally clear to the Court that the language of CRIPA, taken as a whole, does not impliedly grant the Attorney General the power to enter and investigate secure State facilities without the State's consent.

[Statutory] text consists of words living "a communal existence," in Judge Learned Hand's phrase, the meaning of each word informing the others and "all in their aggregate tak[ing] their purport from the setting in which they are used." Over and over we have stressed that "[i]n expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy."

*U.S. National Bank of Oregon v. Independent Ins. Agents of America, Inc.,* 508 U.S. ——, ——, 113 S.Ct. 2173, 2182, 124 L.Ed.2d 402, 417–18 (1993) (citations omitted). Given its setting in a statute that, on its face, authorizes the initiation of a lawsuit when certain stringent requirements are met, the undefined use of the word "investigation" in the certification and notice sections of the statute does not provide a plausible basis for the assertion that Congress intended to vest the Attorney General with broad and unique investigative powers prior to litigation. Furthermore, in light of the explicit statutory requirements the Attorney General must meet before suit can be initiated and discovery is available pursuant to the Federal Rules of Civil Procedure, including the requirement that the Attorney General *personally* certify that extensive pre-litigation requirements have been met, it is wholly implausible to argue that CRIPA allows the Attorney General to merely make unsupported general allegations, notify the State of her intent to investigate, and then authorizes the Attorney General to force her (and her agents') way into secure State facilities over the objection of the State before suit has been filed or *any* of the certifications required by the Act have been made.[2]

---

**1.** This section requires notice by the Attorney General to other federal agencies that provide financial assistance to the suspect State institution "[a]t the time of notification of the commencement of an investigation of [that] institution under section 1997a." Section 1997a, however, deals with the initiation of civil actions, not investigations. It is likely that the reference in § 1997h to § 1997a is an error and that Congress intended to refer to § 1997b. In any event, § 1997h adds nothing to the determination of the nature and scope of the investigation contemplated by Congress.

**2.** In its response to defendants' motion to dismiss, which is not presently before this Court, DOJ argues that the Attorney General consistently has interpreted CRIPA as authorizing pre-litigation access to secure State institutions. Accordingly, in light of its assertion that the intent of Congress regarding such pre-litigation access is unclear, DOJ argues that this Court must defer to the Attorney General's interpretation pursuant to *Chevron, U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). However, because the Court finds no ambiguity with respect to the specific issue of pre-litigation access, the Attorney General's interpretation of CRIPA is not entitled to deference as a general principle of administrative law. In particular, *Chevron* requires judicial deference only to an executive department's interpretation that is "reasonable" in light of the statute and its legislative history. *Id.* at 845, 104 S.Ct. at 2783. As this Court's analysis of the statutory language has made evident, it

## 2. Legislative History

It is clear from the plain language of the statute, read as a whole and in light of its objective, that CRIPA does not authorize the Attorney General to enter and inspect secure State facilities without the State's consent prior to litigation. As a general rule, therefore, the Court is not required to undertake any further statutory analysis in considering plaintiff's request that the Court order such access. Inasmuch as plaintiff relies almost exclusively on CRIPA's legislative history to support its interpretation of the statute, and in view of the likelihood of appeal of this decision, however, the Court will consider the legislative history of CRIPA relied upon by the Attorney General.

In support of its assertion that Congress intended the Attorney General to have wide-ranging investigative powers, plaintiff relies solely on three references to investigations which appear in the 56 pages of the Senate and House Conference Reports which discuss the purpose and objective of CRIPA.[3] Not only is this scant evidence for plaintiff's claim, it is also misleading. Taken in context, the passages relied on by the Attorney General do not support the assertion that in enacting CRIPA, Congress intended to invest the Attorney General with the pre-litigation authority to enter and inspect State facilities without the State's consent.

Plaintiff first relies on the underlined portion of the following paragraph from the House Report:[4]

*Congress recognizes that before initiating litigation with respect to a particular institution, the Attorney General must, of course, thoroughly investigate such institution.* It is anticipated that the States and relevant officials will cooperate in the investigative process. If there is a failure to do so, the Attorney General may consider this factor in taking any actions under this Act.[5]

There is no plausible basis for interpreting this paragraph as an expression of legislative intent that the Attorney General may force her way into secure State facilities to see if she can find sufficient cause to file a lawsuit under CRIPA. In fact, the sentence relied upon by the Attorney General, when read in the context of the entire paragraph, clearly indicates that if a State refuses to cooperate in an investigation, which most certainly would include refusing access to its institutions, the State's lack of cooperation may properly be taken into consideration in the Attorney General's determination of whether to file suit. This section provides no support for the action taken by the Attorney General here—a lawsuit in advance of a CRIPA action seeking to compel such access.

Plaintiff next relies on the following paragraph from the Senate Report in support of its arguments that the statute "contemplates full access in conjunction with other comprehensive investigative measures.":

A number or [sic] factors make the contribution of the Attorney General a unique and invaluable one. First, as noted above, private litigants, even with the assistance of legal services and public interest groups, cannot marshal the resources necessary to mount a full-scale attack on system-wide institutional abuse. The Justice Department, however, does possess such resources. The Department can call upon the FBI to conduct thorough investigations of institutions, taking photographs and collecting relevant data on institutional conditions. It has ready access to the expertise of other Federal agencies, including the Department of Health, Education, and Welfare, the Bureau of Prisons, and the Law Enforcement Assistance Administration, whose experts can evaluate the data collected by the FBI or make independent inspections. Indeed, the committee would expect the Department of Justice normally to consult with HEW and other relevent

---

is not reasonable to interpret CRIPA as a grant to the Attorney General of a pre-litigation right of access to secure State institutions. This conclusion is amply reinforced by the Court's review of CRIPA's legislative history. *See infra.*

**3.** *See infra* text accompanying nn. 5, 6 and 8.

**4.** Pl.Br. at 5

**5.** House Conference Report 96–897 at 12 (U.S.Code Cong. & Admin.News 1980 at 787, 836). Hereinafter H.C.R. at —— (U.S.C.N. at ——).

[sic] agencies in order to determine whether to bring suit and what relief is appropriate. From its past experience in the field, the Justice Department is familiar with and has access to nationally recognized experts in mental health, mental retardation, penology, and public health, and can rely upon such experts for accurate and responsible assessments of the adequacy of institutional conditions. All of these factors contribute to the Department's unique ability to develop a full and fair factual record for the Court.[6]

Nowhere in this paragraph does the Senate Report either state or imply that the "thorough investigation" the plaintiff might request be undertaken by the FBI may be undertaken *as a matter of right* in the absence of cooperation by the State. Furthermore, when this paragraph is read in the context of the entire Senate Report, the "unique and invaluable" contribution of the Attorney General the report discusses clearly refers to the Attorney General's role in prison *litigation,* not pre-litigation investigations designed to ferret out suspected constitutional violations in advance of litigation and before the Attorney General has met *any* of the certification requirements imposed by § 1997b of the Act. This paragraph of the Senate Report would allow, if the Attorney General's interpretation is accepted by the Court, absolutely unfettered access to state prisons and records prior to any litigation by not only the Attorney general and the FBI, as is sought in this case, but also HEW, the Bureau of Prisons (whose role was always understood to manage *federal* facilities before this action), the Law Enforcement Assistance Administration, and "nationally recognized experts" in mental health, mental retardation, penology and public health, all of whom would be entitled, according to the Attorney General, to either evaluate the data collected by the FBI, or make *independent inspections* of the adequacy of institutional conditions. While some or all of these inspections and assessments may indeed be appropriate after the certification requirements of § 1997a and § 1997b have been met and litigation has been commenced under

CRIPA, it is inconceivable that Congress intended that such an intrusive parade of investigators should be entitled to demand access to secure State institutions, copies of an exhaustive array of records, and private interviews with inmates in the custody of the State before *any* of the prerequisites to litigation have been met under the Act. The only reasonable interpretation of this paragraph of legislative history relied upon by the Attorney General is that the Senate Report was discussing the type of technical assistance available to the Attorney General *after* litigation has been filed under § 1997a of CRIPA and discovery has commenced. It would be ironic indeed if *none* of the protections of the Federal Rules of Civil Procedure that apply to site visits and demand for records once litigation has commenced (i.e., Fed.R.Civ.P. 26(b)(2) (discovery which is unreasonably cumulative or duplicative, or is obtainable from other source that is more concrete, less burdensome or less expensive or whose burden or expense outweighs its likely benefit)); Fed.R.Civ.P. 30(d) (examinations being conducted in bad faith or to annoy, embarrass or oppress); Fed.R.Civ.P. 34 (production of documents and things and entry upon land for inspection)) apply here merely because, in this case, the Attorney General alleges, without any proof and without having initiated litigation, that conditions in a State correctional institution *may* deprive inmates of their constitutional rights. If this construction is correct, the Attorney General would be well-advised *not* to give the notices under § 1997b, *not* to make the certifications under § 1997a and § 1997b, and *not* to commence litigation under § 1997a, which would thereby trigger either the statutory limitations on her activities set forth in CRIPA or any of the procedural requirements and safeguards set forth in the Federal Rules of Civil Procedure, until after the Attorney General has demanded and examined every document she conceivably may use in litigation, inspected every nook and cranny in the institution, and interviewed every inmate who may have a gripe about the conditions of confinement. This simply cannot be what Congress intended when it referred to "thor-

---

6. Senate Report 96–416 (S.R.) at 22 U.S.C.N. at    803–804.

ough investigations of the institutions" in the Senate Report.

Finally, any doubt about whether the Senate Report was referring to the Attorney General's ability to conduct a thorough investigation before or after litigation was filed would seem to be resolved by footnote 67, which appears at the end of the above paragraph, and includes the following comment by Stephen Berzon on the Justice Department's role in a prison conditions case:

> We had very little idea what was going on behind those closed fences and institutional walls. The Justice Department was able to hire panels of experts *and through the discovery process to have these experts visit the institutions.*[7]

The third excerpt from the legislative history relied on by plaintiff is the first sentence of the following paragraph of the Senate report:

> Before initiating litigation with respect to a particular institution, the Attorney General must, of course, thoroughly investigate such institution. Such an investigation can be most costly, time consuming, and disruptive of the operation of such institutions. Consequently, the committee expects that the Attorney General would not initiate any investigation of an institution unless he has received from a source outside the Justice Department—either a published report or a person claiming personal knowledge—an allegation that persons residing in such institution are being deprived of rights secured by the Constitution and Federal laws. The committee believes that if conditions in an institution are so bad that Federal litigation may be appropriate, this fact would be made available to Justice by institution employees, neighbors, relatives, reporters, and other Federal agencies.[8]

Plaintiff argues that "Congress would not have recognized the disruption to the operation of the subject institution if it did not intend the United States to enter the physical facility to conduct the investigation." (Pl.Reply Br. at 5–6). The balance of this

paragraph, however, which is not cited by the Attorney General, clearly refutes this argument.

This paragraph in its entirety makes it clear that Congress anticipated that in cases in which "conditions in an institution are so bad that Federal litigation may be appropriate" there will be many sources of information about conditions of confinement available to the DOJ. The observation in the Senate Report that an investigation may be disruptive of the operation of an institution does not establish that the Attorney General has a *right* of access if access is denied by the State. Both the statutory language and the legislative history make it abundantly clear that Congress assumed that any investigation by the Attorney General would be conducted on a cooperative basis. This cooperative approach is required, however, only on the part of the United States. Nowhere in the statute or the legislative history is there any indication that a cooperative approach is *required* of a State, which may choose for any reason not to grant access to its secure facilities or provide the access to records and inmates sought by the Attorney General. If the State cooperates, of course, the investigation may be disruptive of the institution, as noted by the Senate Report. On the other hand, if access is denied, the Attorney General's recourse is to obtain information from the many potential sources identified in the Senate Report, none of which includes the State itself, and then file suit under CRIPA, with all of the attendant procedural requirements and certifications imposed by Congress as a condition of such litigation. There is simply no support in the legislative history of CRIPA that the Attorney General may avoid these statutory requirements by filing a complaint such as this for injunctive relief.

Plaintiff claims that denying the access it seeks will cause it to "rely almost exclusively on sketchy factual information and unverifiable hearsay—a situation Congress could not possibly have intended in authorizing the Attorney General to bring suit." (Pl.Br. at 6–7). This claim is refuted by both the Senate and House Reports which recognize that not-

---

7. S.R. at 22, n. 67 (U.S.C.N. at 804, n. 67) (emphasis added).

8. S.R. at 29 (U.S.C.N. at 811).

withstanding the requirements in § 1997b of pre-suit notification and negotiation, the Attorney General may not be able to specify the precise measures required to correct the alleged abuses before a suit is filed and discovery conducted:

> The committee realizes that before a complaint is filed and discovery conducted, it may be impossible for the Attorney General to specify the precise measures required to correct the alleged abuses.[9]

> \* \* \* \* \* \*

> Congress realizes that before a complaint is filed and discovery conducted, it may be impossible for the Attorney General to specify the precise measures required to correct the alleged abuses.[10]

Given the scope of the investigation that the Attorney General claims is implicit in CRIPA, it is difficult to conceive why Congress assumed the Attorney General would be unable to specify the precise measures required to correct the alleged abuses unless, of course, the Congress was fully aware that the Attorney General might not have access to the institutions in question prior to commencing litigation absent consent of the State.

In its reply brief, plaintiff claims "[e]ven a cursory review of the legislative history of CRIPA makes clear that access to state facilities for investigatory purposes is *assumed* under the statute." (Pl.Reply Br. at 5). As the foregoing analysis of the specific sections of the legislative history relied upon by the Attorney General has demonstrated, neither a cursory nor a detailed review of CRIPA's legislative history supports the argument that access to State facilities is assumed under the statute.

Nowhere in its pleadings does the plaintiff discuss the intent of Congress in enacting CRIPA. The legislative history of CRIPA makes it explicitly clear that the specific

impetus for the enactment of CRIPA was the decision of two federal district courts that, absent express statutory authority, the Attorney General lacked standing to initiate civil actions challenging conditions in State facilities.[11]  Section I of the Senate Report, titled "PURPOSE," states:

> The Maryland and Montana decisions make clear that without a Federal statute clarifying the Attorney General's authority to initiate and to intervene in such suits, the [Justice] Department's litigative efforts to protect the institutionalized will be paralyzed.

> [The Act] provides that authority. *It creates no new substantive rights.* It simply gives the Attorney General legal standing to enforce existing constitutional and Federal statutory rights of institutionalized persons.[12]

Section III of the Senate Report, titled "LEGISLATIVE HISTORY," begins with the following statement: "Since 1976 Congress has indicated a desire to assist the Attorney General in conducting his litigation program on behalf of the institutionalized."[13]

Several other passages in the legislative history underscore the pressing Congressional concern to establish the Attorney General's legal authority to pursue *litigation:*

> Under present law, however, the Attorney General's dependence on the selection of litigation by private parties constitutes a barrier to the most efficient and effective utilization of the Justice Department's resources.[14]

> \* \* \* \* \* \*

> The impact of the *Solomon* and *Mattson* decisions cannot be overstated. . . .  The decisions promise to affect the Attorney

---

9. S.R. at 32 (U.S.C.N. at 814).

10. H.C.R. at 13 (U.S.C.N. at 837).

11. *United States v. Solomon,* 419 F.Supp. 358 (D.Md.1976), aff'd 563 F.2d 1121 (4th Cir.1977); *United States v. Mattson,* No. 74–138–BU (D.Mont.1976), aff'd 600 F.2d 1295 (9th Cir.1979).

12. S.R. at 3 (U.S.C.N. at 790) (emphasis added). This same language is also contained in the House Conference Report at 9 (U.S.C.N. at 833).

13. S.R. at 9 (U.S.C.N. at 790).

14. S.R. at 16 (U.S.C.N. at 797).

General's litigation program in several important respects.[15]

＊ ＊ ＊ ＊ ＊ ＊

It is clear that without express statutory authority to secure judicial enforcement of constitutional and Federal statutory rights of the institutionalized, the Attorney General's litigation program cannot survive. By clarifying the Attorney General's authority to both intervene and initiate such suits, [the Act] allows the Nation's chief law enforcement officer to address the problems of institutional abuse in a systematic fashion, engaging in a program of selective litigation against those institutions where the most egregious constitutional deprivations affect the largest number of people. In this manner, [the Act] permits the Attorney General to utilize the resources of the Justice Department in the most effective manner possible.[16]

These passages from the legislative history—especially the use of phrases such as "litigative efforts," "litigation program," and "judicial enforcement"—make it clear to the Court that, in enacting CRIPA, Congress intended to provide the Attorney General with the specific statutory authority to continue to utilize litigation, either as a plaintiff or an intervenor, that the Maryland and Montana decisions found to be lacking. There is no indication whatsoever in the statute or the legislative history that the Attorney General had the right prior to CRIPA to demand access to State institutions and their records prior to initiating litigation and that CRIPA was intended to continue this right, nor is there any evidence whatsoever that Congress intended to *create* such an important and fundamental right, unaccompanied by any procedural or substantive limitations or safeguards of any kind.

Taken as a whole, the legislative history allows only one interpretation regarding the Congressional purpose for enactment of CRIPA: Congress intended to authorize the Attorney General to initiate or intervene in litigation when necessary to enforce the constitutional and federal statutory rights of institutionalized persons. There is no indication in the legislative history of any intent to invest the Attorney General with unique and broad investigative powers that would require a sovereign State to allow DOJ attorneys and agents to conduct unbridled investigations of secure State facilities without the consent of the State.

### 3. Caselaw

Plaintiff relies on two federal district court opinions, *U.S. v. County of Los Angeles,* 635 F.Supp. 588 (C.D.Cal.1986) and *U.S. v. County of San Diego,* No. 91–0764–R(M) (S.D.Cal. 1991), that plaintiff claims "directly hold the result sought here—the United States must be permitted access to conduct a CRIPA investigation." (Pl.Reply Br. at 5).

In *County of Los Angeles,* DOJ demanded that the Los Angeles County Board of Supervisors provide full access, pursuant to CRIPA, to county juvenile halls and records. Although the county officials were apparently content to allow DOJ the requested access, they were directed by the chief judge of the juvenile court to deny access to the juvenile halls and their records absent an order from the juvenile court, pursuant to a California law which conferred exclusive authority to control access to juvenile records on the juvenile court. After the county concluded they were bound to follow this state law, and denied access, DOJ sought injunctive relief prohibiting the defendants from denying or obstructing access by DOJ to the juvenile halls, the juveniles held therein, and their records.[17] Thus, the issue presented in that case was whether CRIPA preempted state law conferring exclusive jurisdiction on the juvenile court to control access to juvenile records.

The court granted the requested injunctive relief, holding that CRIPA preempted the California statute.[18] In reaching this conclusion, the court correctly concluded that the California statute which vested exclusive jurisdiction over juvenile halls and records in

---

**15.** S.R. at 17 (U.S.C.N. at 798).

**16.** S.R. at 17–18 (U.S.C.N. at 799).

**17.** *County of Los Angeles,* 635 F.Supp. at 589–90.

**18.** *Id.* at 594.

the juvenile court frustrated or obstructed the Congressional intent and purpose of CRIPA. The court then enjoined the County of Los Angeles, its Board of Supervisors, the presiding judge of the juvenile court, and other officials from relying on the California Welfare and Institutions Code, § 827, as authority to restrict or deny access to the juvenile halls, the juveniles held therein and their records. Although the district court relied upon essentially the same excerpts from the legislative history as the Attorney General relies on in this case, the purpose of the court's analysis of the legislative history was to determine if the California statute, which the County Board of Commissioners believed precluded their permitting DOJ access to the juvenile halls and their records, frustrated the spirit of cooperative investigation and improvement implicit in CRIPA. The issue of whether the county could refuse access to the juvenile halls and records, absent the state law relied upon by the juvenile court, was not before the court in *County of Los Angeles.*

Similarly, in *United States v. County of San Diego, supra,* the court considered attempts by San Diego County to utilize various state confidentiality laws or other state procedures to limit DOJ access to county jails. The court first concluded, correctly, that CRIPA expressly requires an investigation prior to the commencement of a CRIPA action. The court then concluded that Congress granted DOJ the authority to go into the specific institution when constitutional deprivations are allegedly taking place, based solely on the paragraph from the Senate Report noting that a thorough investigation can disrupt the operation of an institution.[19] The court then concluded by adopting the preemption analysis employed in *County of Los Angeles, supra.* As in *County of Los Angeles,* there is no thorough analysis of the language of the statute or its legislative history and any reliance on either of these cases beyond the holding that CRIPA preempts state laws that restrict access by DOJ to state or county institutions is misplaced.

Defendants rely on *United States v. State of Hawaii,* 564 F.Supp. 189 (D.Hawaii 1983), which involved a challenge to the right of the United States to bring a CRIPA action against the State of Hawaii, based on the Attorney General's failure to satisfy the statutory prerequisites to filing suit. In granting the State's motion to dismiss, the court found that the Attorney General's certification did not comport with § 1997b. The Attorney General argued that strict compliance with § 1997b should not be required because the State had refused to allow an inspection of the two prisons. In rejecting this argument, the court noted that the House and Senate Reports leave no doubt that Congress anticipated that states and relevant officials will cooperate with the Attorney General.[20] Notwithstanding this expectation of cooperation, the court found that Congress did not give federal investigators the power to enter State prisons without the consent of the State and that DOJ can satisfy the requirements of § 1997b without actually inspecting an institution:

> Notwithstanding expectations about states' cooperativeness, however, it is clear that Congress did not give federal investigators the power to enter a state prison without the consent of the state. Up until the moment when discovery commences during the course of litigation, a state lawfully can force the Justice Department to conduct its investigation through means other than an inspection of the premises. A state's failure to cooperate therefore cannot justify the federal government's failure to comply with its statutory obligations.
>
> The Justice Department generally can satisfy the requirements of section 1997b without actually inspecting the state's prisons. Thus, a state's failure to cooperate probably will force the Attorney General to file suit based on scant or inaccurate information.[8] Such a result is hardly consistent with CRIPA's emphasis on discussion and

**19.** Although the court in *County of San Diego* asserted that support for this position is found at more than one place in the legislative history, the court cited only this excerpt in its opinion. This Court has thoroughly discussed and refuted such

reliance on this excerpt. *See supra* n. 8 and accompanying text.

**20.** *State of Hawaii,* 564 F.Supp. at 194.

consultation between state and federal officials. *See* 42 U.S.C. § 1997b(a)(2). Of course, these considerations do not concern the merits of this case.[21]

---

[8] Congress was well aware that the Attorney General, upon giving notification to a state pursuant to subsection 1997(b)(a)(1), might not have access to the best possible information. The House Conference Report comments on this problem in the context of the Attorney General's duty to inform the state of remedial measures: "Congress realizes that before a complaint is filed and discovery conducted, it may be impossible for the Attorney General to specify the precise measures required to correct the alleged abuses." H.Conf.Rep. No. 897, 96th Cong., 2d Sess. 13, *reprinted in* 1980 U.S.Code Cong. & Ad.News 837.

In this Court's opinion, this well-reasoned analysis of § 1997b and a State's duty to cooperate is sound and persuasive, and is adopted by this Court.

### 4. Supremacy Clause

Plaintiff also claims defendants' denial of access violates the Supremacy Clause of the United States Constitution.[22] This argument, however, is based solely on plaintiff's assumption that CRIPA authorizes the investigative access sought. Therefore, in light of the foregoing analysis, this argument is dismissed without further discussion.

### IRREPARABLE INJURY

Plaintiff claims denial of its motion for a preliminary injunction will ·impair the ability of the Attorney General to fulfill her obligation under CRIPA in the manner intended by Congress. As the Court's analysis has shown, Congress intended that the Attorney General would enforce the rights of institutionalized persons through the normal process of litigation upon the acquisition of sufficient information from the numerous sources available to DOJ. Congress did not intend to grant the Attorney General unrestricted DOJ access to State facilities, staff, records, and institutional residents, in the absence of agreement by the State. In this case, it appears that the Attorney General has made *no* effort to investigate the conditions in the target institutions by the means discussed in

the Senate Report. The Attorney General simply demanded that the State provide access to the institutions, records and inmates. Accordingly, her claims of irreparable injury are hollow indeed.

Plaintiff also argues that denial of its motion for preliminary injunction will impair the Attorney General's ability to protect the constitutional rights of the inmates at CCF and SCF. Absent plaintiff's vague and unsubstantiated allegations, however, the record contains no evidence that inmates of CCF or SCF are being subjected to unconstitutional deprivations. Thus, the Court finds plaintiff has not demonstrated that irreparable injury will occur if the injunction is not issued.

Plaintiff's failure to establish a substantial probability of success on the merits or a likelihood that irreparable injury will occur if the injunction is not issued is fatal to plaintiff's motion. Therefore, the Court is not required to consider the last two factors. *Warner*, 715 F.2d at 1124; *DeLorean*, 755 F.2d at 1228.

### CONCLUSION

The purpose of a preliminary injunction is to maintain the status quo between the parties. The Court may not effect a fundamental alteration of the relative position of the parties. Plaintiff's motion asks the Court to order defendants to allow full access to CCF and SCF and the institutional records and staff, and to order defendants to allow DOJ investigators to conduct private interviews with inmates. Clearly, then, granting plaintiff's request for injunctive relief would effect a fundamental alteration of the relative position of the parties. Furthermore, plaintiff's requested relief is not supported by the statute itself, its legislative history, or the cases relied upon by plaintiff. This Court respectfully concludes that CRIPA does not grant plenary prelitigation investigative powers to the Attorney General, and that plaintiff has failed to offer any creditable evidence of injury, irreparable or otherwise. Therefore, it is the decision of the Court that plaintiff's

---

**21.** *State of Hawaii*, 564 F.Supp. at 195 and n. 8.    **22.** U.S. Const., art. VI, cl. 2.

motion for preliminary injunction must be and is hereby **DENIED.**

**IT IS SO ORDERED.**

## APPENDIX A

1. Monthly census figures from January 1, 1993 to the present, for the overall population and also broken down by classification status;

2. A schematic diagram or floor-plan (to scale) of the facility;

3. Current policies and procedures for medical and mental health care services;

4. A list of all prisoner deaths occurring at the prison from January 1, 1992, to the present (please have available for our on-site review all medical records, autopsies, and internal reports or investigations regarding the inmate deaths);

5. A list of all prisoners who suffered any miscarriages or still births at the prison from January 1, 1992, to the present (please have available for our on-site review all medical records, autopsies and internal reports or investigations regarding any miscarriages or still births suffered by inmates at the prison);

6. Copies of all grievances submitted by inmates related to medical care from January 1, 1992, to the present;

7. Copies of any reports or other documentation relating to any emergency medical procedures performed on inmates at the prison or upon transfer from the facilities to a hospital between January 1, 1992, to date;

8. A list of all inmates sent to hospitals from the prison from January 1, 1992, to date, with the reasons for the transfer;

9. Documentation reflecting actual medical expenditures (include medical costs), for fiscal years 1992 and 1993, and amount budgeted for 1994 and 1995;

10. A list of medical care personnel (part or full time) providing services at the prison, detailing whether they are employee(s) or outside consultants;

11. Copies of staffing patterns by shifts and by staffing categories of physicians, nurses and medical technicians;

12. Copies of the credentials of the medical director, nursing director and medical technicians.

13. Copies of all contracts regarding medical staff, paramedic services, pharmaceutical services, medical care providers and/or vendors to include contracts with any hospitals;

14. Copies of policies and procedures relating to all intake medical and mental health screening including, but not limited to, suicide screening upon admission;

15. Any reports or documentation regarding suicides or attempted suicides at from January 1, 1992, to the present;

16. A list of the inmates with the following chronic illnesses: diabetes, hypertension, asthma, and seizure disorders (please indicate which prisoner has which chronic illness);

17. A list of the inmates with TB prophylaxis;

18. A list of the inmates who are currently pregnant or were pregnant at the prison anytime during their incarceration at from January 1, 1992, to date;

19. Copies of all monthly reports and committee minutes including, but not limited to, Health Services reports, Quality and Assurance Reviews, Pharmacy reports and Medical Administrative reports;

20. Copies of all protocol documents and/or manuals regarding communicable diseases, isolation of inmates and nursing;

21. Copy of a list of all medications administered at the prison from January 1, 1992 to the present;

22. Copy of a list of all inmates from January 1, 1992, to the present, who are/were on psychotropic medication including the specific medication and dosage prescribed, as well as the diagnosis.

23. An organizational chart showing the administrators of the prison and lines of reporting authority;

24. Lists of prison staff, setting forth their gender, job classification and work assignments by day and shift;

25. A copy of all written policies and procedures for prison operations including, but not

limited to, prison policies regarding pat down searches, cross-gender supervision, staff discipline, staff training (pre-service and in-service), inmate grievances, suicide prevention;

26. Any reports, grievances or other documentation similarly denominated including, but not limited to, reports of over-familiarity, sexual conduct, sexual assault, and sexual harassment involving prison staff and prisoners;

27. Documentation regarding any and all disciplinary action taken against any prison staff from January 1, 1992, to the present involving reports of over-familiarity, sexual conduct, sexual assaults, and sexual harassment, involving CCF and SCF staff and prisoners;

28. A list of all manuals or other documents used to train prison correctional personnel; and

29. A list of all programs and support groups offered to prisoners.