**CSX TRANSPORTATION, INC.,
Plaintiff–Appellant,**

v.

**TENNESSEE STATE BOARD OF
EQUALIZATION, Defendant–
Appellee.**

No. 91–5270.

United States Court of Appeals,
Sixth Circuit.

Argued Oct. 29, 1991.

Decided May 15, 1992.

Janis M. Wild, Laughlin, Halle, McBride, Lunsford & Fletcher, Memphis, Tenn., Gareth S. Aden, Gullett, Sanford, Robinson & Martin, Nashville, Tenn., James W. McBride, (argued and briefed), Laughlin, Halle, McBride, Lunsford & Fletcher, Washington, D.C., for plaintiff-appellant.

Daryl J. Brand, Asst. Atty. Gen. (briefed), Jimmy G. Creecy, Asst. Atty. Gen. (argued and briefed), Charles W. Burson, Atty. Gen., Office of Atty. Gen. of Tennessee, Nashville, Tenn., for defendant-appellee.

Before: RYAN and BOGGS, Circuit Judges; and GODBOLD, Senior Circuit Judge.[*]

BOGGS, Circuit Judge.

CSX is an interstate railroad operating in Tennessee. CSX filed this suit against the Tennessee Board of Equalization under § 306 of the Railroad Revitalization Act and Regulatory Reform Act of 1976, currently codified at 49 U.S.C. § 11503 [1], which prohibits discriminatory state taxation of railroads. At the outset of the litigation, CSX moved for a preliminary injunction against the further assessment, levy or collection of discriminatory ad valorem taxes in Tennessee. The district court denied the motion for a preliminary injunction and CSX appeals that decision to this court. For the reasons set forth below, we affirm the district court's denial of a preliminary injunction.

---

[*] The Honorable John C. Godbold, Senior Circuit Judge for the United States Court of Appeals for the Eleventh Circuit, sitting by designation.

1. 49 U.S.C. § 11503 is the recodification of § 306 of the Railroad Revitalization and Regulatory Reform Act of 1976, Pub.L. No. 94–210, 90 Stat. 31, 54, first codified at 49 U.S.C. § 26c (1976). The original Act was recodified in 1978. See Act of Oct. 17, 1978, Pub.L. 95–473, 92 Stat. 1337 *et seq.* The language of the recodification differs slightly from the original language of § 306. However, such changes "may not be construed as making a substantive change in the laws replaced." § 3(a), 92 Stat. 1466. *See also, Burlington R.R. Co. v. Oklahoma Tax Comm'n,* 481 U.S. 454, 457 n. 1, 107 S.Ct. 1855, 1858 n. 1, 95 L.Ed.2d 404 (1987). For this reason, no Senate Report was filed for the recodification. For convenience, we will cite to the recodification.

I

The purpose of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4R Act") was to "provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system in the United States." § 101(a). Congress included § 306 to further these goals, particularly the goal of restoring the financial stability of the railroads. Section 306 was meant to eliminate the longstanding burden of discriminatory state and local taxation of railroad property. The relevant provisions of § 306, now § 11503, are as follows:

(b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a state or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property;

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection;

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation subject to the jurisdiction of the Commission under subchapter I of chapter 105 of this title.

(c) Notwithstanding section 1341 of title 28 and without regard to the amount in controversy or the citizenship of the parties, a district court of the United States has jurisdiction, concurrent with other jurisdiction of courts of the United States and the States, to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value to true market value is governed by State law.

Section 11503(a)(3) defines "rail transportation property" as property, as defined by the Interstate Commerce Commission, owned or used by a rail carrier providing transportation subject to the jurisdiction of the Commission. Further, "commercial and industrial property" means property, other than transportation property and land used primarily for agricultural purposes or timber growing, devoted to a commercial or industrial use and subject to a property tax levy. § 11503(a)(4).

The original Section 306(2) expressly conferred jurisdiction on United States district courts "to grant such mandatory and prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate" any violations of the section. Since language changes that have occurred were not intended to be substantive, the recodification of § 306(2) at § 11503(c) also grants the authority to district courts to issue injunctive relief to prevent or terminate violations of § 11503(b). *Atchison, T. & S.F. Ry. v. Lennen*, 640 F.2d 255 (10th Cir.1981). Section 11503(c) is an exception to the Tax Injunction Act, 28 U.S.C. § 1341 (1988), which provides that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." See also *Burlington Northern R.R. v. Department of Revenue*, 934 F.2d 1064, 1067 (9th Cir. 1991).

 Under traditional equitable principles for granting a preliminary injunction in this Circuit, a court must consider (1) whether the moving party has a substantial probability of success on the merits; (2)

whether irreparable injury will occur if the injunction is not issued; (3) whether the injunction will have a harmful effect on third parties; and (4) whether the public interest would be served by the injunction. *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985). In addition, an injunction generally should not issue if there is an adequate remedy at law. *EBSCO Indus. v. Lilly*, 840 F.2d 333, 335–36 (6th Cir.), *cert. denied*, 488 U.S. 825, 109 S.Ct. 73, 102 L.Ed.2d 50 (1988). However, since Congress has expressly authorized the granting of injunctive relief to halt or prevent a violation of § 11503, traditional equitable criteria do not govern the issuance of preliminary injunctions under § 11503. *Burlington Northern* 934 F.2d at 1074–75; *Trailer Train R.R. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983); *Lennen*, 640 F.2d at 259–60; *State of Tenn. v. Louisville & N. R.R.*, 478 F.Supp. 199, 210 (M.D.Tenn.1979). *See also United States v. City and County of San Francisco*, 310 U.S. 16, 30, 60 S.Ct. 749, 756, 84 L.Ed. 1050 (1940). In order to issue a preliminary injunction under § 11503, a court must determine only whether there is "reasonable cause" to believe that a violation of § 11503(b) has occurred or is about to occur. *Lennen*, 640 F.2d at 261.

## II

In this case, CSX challenges several aspects of Tennessee's taxation system as discriminatory violations of § 11503(b). In Tennessee, all taxable real and personal property, including commercial and industrial property, is assessed by local assessors for the purpose of levying and collecting ad valorem taxes. T.C.A. §§ 67–5–102 and 67–5–103. Assessments of real property are made locally by periodic reevaluations by local assessors. Personal property is assessed annually on the basis of information supplied by property owners. However, the property of common carriers and public utilities is appraised annually at the state level by the Tennessee Public Service Commission. T.C.A. § 67–5–1301. The Commission appraises the value of a rail-

road's property as a single statewide unit and then apportions parts of the property's value to counties and municipalities according to statutory apportionment formulas. See T.C.A. §§ 67–5–1302(a)(2), 67–5–1323, 67–5–1324, and 67–5–1325.

Real and personal property is assessed for taxation at percentages of its true market value known as assessment ratios. T.C.A. §§ 67–5–801(a) and 67–5–901(a). An assessment ratio is the ratio of the assessed value to the true market value of the property. Pursuant to Article II, Section 28 of the Tennessee Constitution, railroad real property is assessed at 40% of its true market value. Under its Constitution, Tennessee also assesses industrial and commercial property at 40% of its true market value. The state assesses railroad personal property at 30% of its true market value. Industrial and commercial personalty is also assessed at 30% of its value.

Assessments of railroad property are made annually by the Commission, primarily on the basis of information supplied by property owners in a schedule filed with the Assessment Division. T.C.A. § 67–5–1301. The Commission first conducts a mass appraisal of the "unit value" for all of the railroad's operating property in its entire multi-state system. T.C.A. § 67–5–1302. The Commission then applies an allocation factor to apportion part of the system's value to Tennessee. T.C.A. §§ 67–5–1322, 1323. Finally, the Commission distributes assessed taxation values for railroad property to the various counties and municipalities in Tennessee according to the statutory apportionment formulas.

The State Board of Equalization reviews the assessments made by the Public Service Commission. T.C.A. § 67–5–1328. The State Board of Equalization is part of an elaborate statutory process in Tennessee to ensure that centrally valued railroad property is assessed at the same level as locally valued property. T.C.A. § 67–5–1603, *et seq.* The local assessment of property values is usually below 100% of fair market value because most counties do not value all real property annually. Railroad

property, on the other hand, is appraised annually at full value by the Commission. More frequent assessment generally results in higher relative taxation, since more of the actual current market value is captured in the assessed value to which the statutory assessment ratios are then applied. In Tennessee, a statutory process known as equalization is meant to ensure that centrally valued railroad property is assessed at the same level as local, county assessed property. As part of this process, the Board of Equalization conducts appraisal ratio studies in all counties of the state every two years. T.C.A. § 67–5–1605(b)(1). The Board then certifies to the Commission the appraisal ratios for each county so that they may be applied to railroad property. T.C.A. § 67–5–1606(c). The Board reviews the Commission to ensure that the appraisal of railroad property has been "equalized" on the basis of the median appraisal ratios for each county. T.C.A. § 67–5–1328. So, the Commission submits its estimates to the Board and, after review, the Board certifies the final values back to the Commission. The Commission then certifies the assessments to local officials for collection. T.C.A. § 67–5–1331(a).

In addition, the following aspects of the Tennessee tax code are relevant to this case. Business inventories, and farm and non-business personal properties are exempt from personal property taxation. T.C.A. § 67–5–901(a). However, unlike railroads, industrial and commercial businesses whose inventories are exempt must pay a Business Tax. T.C.A. § 67–4–701 *et seq.* Further, residential and farm real property is assessed at 25% of its value.

This case involves over $1 million in disputed tax payments due by CSX to Tennessee. CSX filed its motion to enjoin the state of Tennessee from assessing, levying or collecting the allegedly discriminatory taxes. CSX supported its motion with two expert affidavits. Tennessee responded with five affidavits of its own. As stated, the district court declined to issue CSX a preliminary injunction.

In count I of its complaint, CSX argued that there was "reasonable cause to believe" that Tennessee had violated § 11503(b)(4), which prohibits the imposition of "another tax that discriminates against a rail carrier," by imposing ad valorem taxes on CSX's personal property while other major classes of commercial and industrial personal property are untaxed or undertaxed. CSX claims that this results from the fact that certain classes of commercial and industrial personal property are exempt from taxation. In addition, contends CSX, major classes of business personalty go undertaxed because of undervaluation and underreporting. According to CSX, the factors of Tennessee's exemption scheme, underreporting, and underassessment result in the railroad's personal property being taxed in its entirety, while only approximately 27.5% of the aggregate value of all other business and commercial personalty in Tennessee was taxed. Over one-third of CSX's rail transportation property is personalty. CSX contends that, under the circumstances, § 11503(b)(4) prohibits the state from imposing any taxes on the railroad's personal property or, alternatively, from taxing more than 27.5% of the true market value of its personalty.

In count II, CSX alleged that the Board had violated §§ 11503(b)(1) and (b)(2) by failing to equalize the valuation of its real property with that of locally assessed commercial and industrial real property. Specifically, CSX contends that the Board assessed CSX real property for purposes of ad valorem taxation for the 1990 tax year at an average ratio of assessed value to true market value (expressed as a percentage of true market value) of no less than 82%, while the real property of other commercial and industrial taxpayers in Tennessee was assessed at no more than 73.9% of market value.

The district court reviewed the respective affidavits and held that CSX had not established, based on the evidence submitted, reasonable cause to believe that either of the alleged violations had occurred or were about to occur. The court, therefore, denied CSX's motion for a preliminary injunction.

## III

■ The decision of whether or not to issue a preliminary injunction lies within the discretion of the district court. This court, therefore, reviews a preliminary injunction determination under the abuse of discretion standard. *NAACP v. City of Mansfield*, 866 F.2d 162, 166–67 (6th Cir. 1989). A district court abuses its discretion when it relies on clearly erroneous findings of fact or when it improperly applies the law. *Christian Schmidt Brewing v. G. Heileman Brewing*, 753 F.2d 1354, 1356 (6th Cir.), *cert. dismissed*, 469 U.S. 1200, 105 S.Ct. 1155, 84 L.Ed.2d 309 (1985). The issue of whether the district court abused its discretion here depends primarily on the proper contours of the "reasonable cause to believe" standard employed in § 11503 cases.

CSX presented the affidavit of Dr. Dick Netzer in support of its first allegation that Tennessee's taxation scheme violates § 11503(b)(4). Dr. Netzer is a Professor of Economics and Public Administration who was asked by CSX to prepare estimates of the market value of business inventories, locally-assessed machinery and equipment, and locally-assessed farm machinery and livestock in Tennessee as of December 31, 1987. In addition, Netzer was asked to calculate the relationships between the estimated fair market values of those properties and the assessed values and corresponding full values of the properties as they appear on the Tennessee tax rolls as reported by the State Board of Equalization. Using various methods, Netzer concluded that as of December 31, 1987, only 21.8% of the estimated market value of locally-assessed personal property was taxed in the state of Tennessee (If the value of motor vehicles is excluded, the percentage of personal property actually taxed is 23.9%). *Netzer Aff.* at 6. Netzer attributes this undertaxation to the statutory exemption of certain business inventories and farm machinery and livestock, and the fact that business equipment is underreported and/or undervalued. *Ibid.* CSX claims that this amounts to a violation of § 11503(b)(4).

Tennessee responded by arguing that (1) the court should not consider the impact of personal property exemptions under the plain meaning of § 11503; (2) even if § 11503 does require consideration of various statutory exemptions, the Tennessee exemption scheme is neutral and does not discriminate against railroads; and (3) the methodology of CSX's experts is faulty and does not provide reasonable cause to believe there is or will be a violation of the Act. The district court held that courts may consider the impact of state schemes of personal property exemptions when determining whether a violation of § 11503(b)(4) has occurred. Second, the district court considered whether the exemption scheme was nondiscriminatory. The state argued that its taxation system is equitable since commercial and industrial businesses that receive an inventory exemption are subject to a business tax on gross receipts. CSX does not receive the inventory deduction but it is not subject to the business tax. Further, argued the state, if CSX had any inventory intended for sale it could receive the deduction, so the exemption is nondiscriminatory. After a review of the case law, the district court held that it must consider not only the language, but also the impact, of the inventory exemption. Discrimination violative of § 11503(b)(4) could be achieved by exempting most commercial and industrial property through the use of facially neutral exemptions, such as inventory exemptions, that nonetheless have a discriminatory effect on railroads.

The district court then examined Tennessee's taxation of commercial and industrial personal property compared to the state's taxation of railroad personalty, given the effect of the various challenged exemptions. In order to determine whether CSX had met the "reasonable cause to believe standard," the court looked to the Netzer affidavit as well as those presented by the Board of Equalization to counter Netzer's methodology. The affidavits of Dr. Harry Green and Dr. William Fox both attacked and undermined various assumptions and calculations made by CSX's expert, Dr. Netzer, in concluding that Tennessee's tax-

ation scheme results in discrimination against the railroad. Dr. Green, for instance, maintains that if Netzer's methodology for valuing non-railroad property is applied to CSX's railroad property, it would yield a market value that is over three times the value currently placed on railroad property by the state. The district court recognized the implication of Dr. Green's affidavit that Netzer's analysis vastly overvalues commercial and industrial personal property in Tennessee. Green's affidavit, therefore, undermines CSX's contention that it is suffering discrimination. After considering the conflicting affidavits concerning CSX's first claim, the district court concluded:

> [T]he Court finds that CSX has not demonstrated reasonable cause to believe that Tennessee's taxation system violates § 11503(b)(4) of the 4R Act and that injunctive relief should issue. The Court is confronted with conflicting evidence about whether Tennessee's taxing system results in an unfair and discriminatory tax burden on the railroads. Dr. Netzer's affidavit supports the likelihood that such a violation could occur. But Dr. Greene's [sic] affidavit calls into question the validity of such an analysis. A preliminary injunction under the 4R Act does not automatically issue upon supporting evidence by a plaintiff. The court must consider all the evidence and reach a determination that the plaintiff has satisfied the "reasonable cause" hurdle. In this particular case, considering the divergent evidence before it, the Court is not convinced that CSX has established a "reasonable probability of success ... in order for a preliminary injunction to issue." *Lennen,* 640 F.2d at 261.
>
> The denial of the preliminary injunction is not intended to be a ruling on the merits of this case or that CSX's methodology of valuation is faulty. The parties will have ample opportunity to battle about the accuracy of CSX's analysis at a subsequent hearing on the merits.

*Mem. Op.* at 17–18.

The district court dealt with CSX's second challenge to Tennessee's state taxation scheme in much the same way. CSX alleged that Tennessee violated §§ 11503(b)(1) and (b)(2) by imposing ad valorem taxes on the railroad's real property at an average ratio of assessed value to true market value of no less than 82% while other commercial and industrial real property in the state was assessed at an average ratio of assessed value to true market value of no more than 73.9%. As stated above, § 11503(b)(1) prevents states from imposing any tax on railroad property at a higher ratio of assessed value to true market value than the ratio at which commercial property is assessed. Section 11503(b)(2) prohibits the levy or collection of a tax on an assessment that violates § 11503(b)(1). In order to obtain an injunction, a railroad must show at least a five percent difference between the ratio of assessed value to true market value of its property and the ratio of assessed value to true market value of other commercial and industrial property. § 11503(c). CSX claims that it has established more than this requisite 5% gap.

In making its determination regarding CSX's second claim, the district court was again faced with a battle of affidavits. CSX presented the court with the affidavit of Dr. Frederick Ekeblad to establish the alleged gap in the relative ratios of assessed values to true market values. The state countered with the affidavit of Mr. Kenneth Morrell, the state Assessment Systems Manager, which challenged Ekeblad's methodology and asserted that commercial and industrial real property in Tennessee was appraised at approximately 87% of true market value for the tax year 1989. This result would make Tennessee's taxation scheme perfectly consistent with § 11503. The district court ultimately held that CSX had failed to establish the requisite reasonable cause to believe that a violation of the Act had occurred or was imminent and, therefore, denied CSX's motion for a preliminary injunction.

## IV

On appeal, CSX argues that the district court abused its discretion because it

incorrectly applied the "reasonable cause to believe" standard. CSX contends that the two affidavits it submitted to the district court were enough to establish a prima facie case of discriminatory taxation and, therefore, were sufficient to meet the "reasonable cause" standard. CSX argues that the standard does not require the court to engage in any extensive fact finding, nor may a district court resolve conflicts in the evidence. CSX supports its argument with the following language from a Sixth Circuit case discussing the "reasonable cause" standard in the context of the National Labor Relations Act:

> [A] section 10(j) hearing is only a "reasonable cause" hearing—the Board does not have to prove, and the district court is not required to find, that an unfair labor practice occurred. In making a reasonable cause determination, the district court and this court on appeal are not supposed to resolve conflicts in the evidence. The evidence available to the district court was clearly adequate to determine whether the Board had reasonable cause to believe unfair labor practices had occurred. Since the district court is not permitted to resolve conflicts in the evidence, a "complete" story is not necessarily required to make this determination.

*Gottfried v. Frankel*, 818 F.2d 485, 493 (6th Cir.1987) (citations omitted). CSX claims that this case supports its characterization of the "reasonable cause to believe" standard as relatively easy to meet. CSX maintains that the district court applied a stricter standard for a preliminary injunction than is required under § 11503.

■ We hold that the district court did not abuse its discretion in applying the "reasonable cause to believe" standard to the facts of this § 11503 case. In order for a preliminary injunction to issue under § 11503, the plaintiff must present evidence sufficient to establish reasonable cause to believe that a violation of the Act has occurred or is likely to occur. More precisely, in order to be granted a preliminary injunction, a moving party must establish a reasonable probability of a violation of the Act. In this case, the district

court found that CSX had simply "not produced enough evidence to show reasonable cause to believe that a violation of § 11503 of the 4R Act will occur." *Mem. Op.* at 21. The district court did not, as CSX suggests, ultimately resolve conflicts in the evidence presented in this case. In fact, the district court expressly stated that the "denial of the preliminary injunction is not intended to be a ruling on the merits of this case or that CSX's methodology of valuation is faulty." *Id.* at 18.

■ The fundamental dispute in this case concerns the nature of the "reasonable cause to believe" standard. It certainly cannot be met, as CSX seemingly argues, by simply showing the possibility of a violation of § 11503. A preliminary injunction should not issue *per se* whenever a plaintiff in a § 11503 case presents an affidavit purporting to establish a violation of the Act. The mere "possibility" that a violation will occur is not enough. A party must establish, to the satisfaction of the district court acting within its discretion, a reasonable probability that a violation of the Act has occurred or will occur.

If the standard could be met merely by presenting an affidavit from an expert claiming, based on any methodology, that a state's taxation scheme discriminated against railroads, then the decision of whether to issue an injunction would, in most instances, be taken out of the hands of the district court. No suit is filed under § 11503 in the first place unless a party feels that a state's taxation scheme, as characterized by that party, discriminates on its face or in operation. However, preliminary injunctions cannot and should not issue every time a § 11503 suit is filed, and the plaintiff moves for such an injunction supported by some scintilla of evidence. The district court must make a preliminary determination, based on the evidence that has been submitted by the plaintiff and the responses made at that point, whether there is reasonable cause to believe that the Act has been violated.

■ CSX further suggests that the reasonable cause standard somehow permits

the district court to review only that evidence presented by the party moving for the injunction. In other words, the argument is that since the court may not *resolve* conflicts in the evidence at the preliminary injunction stage, then the court may not even recognize or consider the existence of such conflicts. In deciding whether the plaintiff has met its burden under the reasonable cause standard, a district court must review and evaluate the evidence presented by the moving party and determine whether that evidence establishes a reasonable probability of discriminatory taxation. In evaluating the sufficiency of the evidence presented by a plaintiff moving for an injunction, the district court is not confined solely to the testimony presented in the plaintiff's affidavits and other submissions to the court. On the contrary, the district court is entitled to consider opposing submissions presented by the defendant, calling into question the plaintiff's assumptions, methodology, or conclusions. If the district court finds that the plaintiff's preliminary evidence is questionable enough to fall short of the "reasonable cause to believe" standard, the court is well within its discretion in refusing to grant a preliminary injunction.

This preliminary consideration of the evidence in order to make the "reasonable cause" determination is perfectly consistent with the fact that district courts are precluded from making an ultimate resolution of a conflict in the evidence at such an early stage in the proceedings. Evidentiary conflicts must not be resolved, but they should be evaluated, by a district court faced with a preliminary injunction determination under § 11503. After reviewing the affidavits presented in this case, we conclude that the district court was well within the bounds of its discretion in choosing not to issue a preliminary injunction. Under the abuse of discretion standard, a reviewing court cannot overturn a district court solely because it would have made a different decision under the circumstances. Since we cannot say that the district court abused its discretion in this case, there can be no reversal.

At oral argument, CSX urged this court to consider the fact that if it were forced to pay these taxes to the various localities in Tennessee, it might never recover these funds if the case is ultimately resolved in its favor. First of all, a diligent district court can certainly craft a remedy, such as future tax credits, that would ensure recoupment of the funds. More importantly, however, is the fact that such a consideration has no place in the "reasonable cause" analysis. CSX must abide by the "reasonable cause to believe standard," which it has so vigorously advanced and supported in this case. CSX cannot abandon the standard when it no longer serves the railroad's purposes. The standard precludes the court from considering anything except the reasonably probable outcome of the case, insofar as it can be determined at the current stage in litigation.

V

For the reasons discussed, we AFFIRM the district court's denial of a preliminary injunction to CSX.