dues that only come due periodically.  Further, the decision in *McKelvie* supports Perceptron's position.  There, the court affirmed the denial of prejudgment interest from the date the complaint was filed, because the claim on which the plaintiff prevailed was added by amendment and actually arose when the no-fault insurer reduced the plaintiff's benefits sometime after the original complaint was filed.  The court also indicated that if the prejudgment interest had related to a claim that was stated in the original complaint, the denial of interest would be reversed.  In fact, in *Phinney,* the court held that prejudgment interest had to be calculated from the filing of the complaint even though the plaintiff had prevailed on a new theory that was added by an amended complaint.

In this case, the breach of contract claim was alleged in the complaint and clearly arose before the complaint was filed.  This is not altered by the fact that, as with many claims, SAMI's continued breach allegedly resulted in damages that did not accrue until after the complaint was filed.  We find this case to be analogous to the recent decision in *H.J. Tucker and Associates, Inc. v. Allied Chucker and Engineering Co.,* 595 N.W.2d 176, 183 (Mich. App. 1999), *appeal denied*, 607 N.W.2d 722 (Mich. 2000), which affirmed an award of prejudgment interest on the entire judgment, "including that portion of damages that reflected commissions due after the complaint was filed but before entry of judgment, from the date that the original complaint was filed."  Consistent with the plain meaning of the statute, Perceptron is entitled to prejudgment interest on the damages awarded on its breach of contract claim from the date the complaint was filed.

For the reasons set forth above, we **AFFIRM** the district court's denial of SAMI's motion for judgment as a matter of law, or for new trial, and the district court's denial of Perceptron's motion for equitable extension of the non-compete agreement.  We **REVERSE** only with respect to the prejudgment interest calculation and **REMAND** for entry of judgment in accordance with this opinion.

*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION:  2000 FED App. 0247P (6th Cir.)
File Name:  00a0247p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

PERCEPTRON, INCORPORATED, a Michigan Corporation,
        *Plaintiff-Appellee/*
        *Cross-Appellant,*

        *v.*

SENSOR ADAPTIVE MACHINES, INCORPORATED (SAMI), a Canadian Corporation,
        *Defendant-Appellant/*
        *Cross-Appellee.*

Nos. 99-1456/1498

Appeal from the United States District Court for the Eastern District of Michigan at Detroit.
No. 96-73620—Anna Diggs Taylor, District Judge.

Argued:  June 20, 2000

Decided and Filed:  July 24, 2000

Before:  MERRITT, GUY, and COLE, Circuit Judges.

———————————

**COUNSEL**

———————————

**ARGUED:** Clay A. Guise, FEENEY, KELLETT, WIENNER & BUSH, Bloomfield Hills, Michigan, for Appellant. Robert J. Lenihan II, HARNESS, DICKEY & PIERCE PLC, Troy, Michigan, for Appellee. **ON BRIEF:** Clay A. Guise, S. Thomas Wienner, FEENEY, KELLETT, WIENNER & BUSH, Bloomfield Hills, Michigan, Roger H. Cummings, DICKINSON, WRIGHT, PLLC, Bloomfield Hills, Michigan, for Appellant. Robert J. Lenihan II, HARNESS, DICKEY & PIERCE PLC, Troy, Michigan, for Appellee.

———————————

**OPINION**

———————————

RALPH B. GUY, JR., Circuit Judge. Plaintiff, Perceptron, Inc., and defendant, Sensor Adaptive Machines, Inc. (SAMI), appeal from the judgment entered following a jury trial on their respective claims and the district court's disposition of several post-trial motions. The jury found in favor of Perceptron on its breach of contract claim, alleging that SAMI breached a non-compete agreement, and the jury awarded Perceptron $732,223.19 in damages. The jury found against SAMI on its counterclaims, which alleged that the non-compete agreement violated antitrust laws and that Perceptron's response to the perceived breach of the agreement constituted tortious interference with business relationships.

SAMI appeals from the district court's denial of its motion for judgment as a matter of law, or for new trial, on Perceptron's breach of contract claim and SAMI's counterclaims. Perceptron appeals from the district court's post-trial denial of Perceptron's request for an equitable extension of the non-compete agreement as a further remedy

---

the date that the complaint was filed. The prejudgment interest statute is remedial in nature and is to be construed liberally in favor of the prevailing party. *See Denham v. Bedford*, 287 N.W.2d 168 (Mich. 1980); *Phinney v. Perlmutter,* 564 N.W.2d 532, 549 (Mich. App. 1997). The purpose of awarding statutory prejudgment interest is not only to compensate the prevailing party for the delay in the use of the money, but also to offset the costs of bringing the action and to provide an incentive for prompt settlement. *See Hadfield v. Oakland County Drain Comm'r*, 554 N.W.2d 43, 46 (Mich. App. 1996). The statute must be applied in accordance with its plain terms. *See Paulitch v. Detroit Edison Co.*, 528 N.W.2d 200 (Mich. App. 1995); *Om-El Export Co. v. Newcor, Inc.,* 398 N.W.2d 440, 445 (Mich. App. 1986).

The parties rely upon two lines of authority from the Michigan Court of Appeals with seemingly divergent applications of the prejudgment interest statute. SAMI contends that prejudgment interest on post-complaint damages should be calculated from the date the claim arose, not the filing of the complaint, in order that the prevailing party be compensated only for actual delay in receiving compensation. *See, e.g., Beach v. State Farm Mut. Auto. Ins. Co.,* 550 N.W.2d 580 (Mich. App. 1996); *McKelvie v. Auto Club Ins. Ass'n.,* 512 N.W.2d 74 (Mich. App. 1994); *Farmers Ins. Group v. Lynch,* 465 N.W.2d 21 (Mich. App. 1990); *Central Mich. Univ. Faculty Ass'n v. Stengren,* 370 N.W.2d 383 (Mich. App. 1985); and *Foremost Life Ins. Co. v. Waters*, 337 N.W.2d 29 (Mich. App. 1983).

In *Beach*, the court explained that "[f]or claims that arise after the complaint is filed," "prejudgment interest regarding subsequent claims would be properly awarded from the 'date of delay,' i.e., the postcomplaint date on which the insurer refused to pay and the delay in receiving money began." *Beach,* 550 N.W.2d at 586. The reasoning in *Beach, Lynch,* and *Stengren* is inapposite here because this case does not involve an obligation similar to insurance benefits or service

## C.   Prejudgment Interest

Prejudgment interest is a substantive element of damage which must be determined under state law, in this case Michigan law, when jurisdiction is based upon diversity of citizenship. *See Bailey v. Chattem, Inc.*, 838 F.2d 149, 152 (6th Cir. 1988); *Lynch v. Electro Refractories & Abrasives Corp.,* 408 F.2d 363, 364 (6th Cir. 1969). In Michigan, prejudgment interest is not discretionary as the statute provides in relevant part that "interest on a money judgment recovered in a civil action shall be calculated . . . from the date of filing the complaint" and "shall be calculated on the entire amount of the money judgment, including attorney fees and other costs." MICH. COMP. LAWS ANN. § 600.6013(6) (West Supp. 2000). The statute excepts from this proscription prejudgment interest on future damages for personal injuries. *See* MICH. COMP. LAWS ANN. § 600.6013(1). The Michigan courts have held that a trial court's interpretation of the prejudgment interest statute is a question of law, which is reviewed *de novo. See Attard v. Citizens Ins. Co.,* 602 N.W.2d 633, 637 (Mich. App. 1999).

In support of its damage claim, Perceptron prepared a schedule of the jobs that it claimed to have lost to SAMI as a result of the breach, for a total estimated damages of over $2.5 million. The jury awarded a lump sum amount for damages arising from SAMI's breach of the non-compete agreement. Perceptron sought prejudgment interest on the entire amount calculated from the date that the complaint was filed. SAMI argued that no interest should be awarded, but that any interest should accrue only on a pro-rata basis from the time that the damages arose. The district court agreed and decided that interest would be calculated pro-rata on the jobs for which Perceptron sought damages from the date of each purchase order. Accordingly, the amended judgment included prejudgment interest in the amount of $115,288.81.

We are convinced Michigan law requires that prejudgment interest be calculated in this case on the entire judgment from

for its breach. Perceptron also appeals from the district court's calculation of prejudgment interest. After careful review of the record and the arguments presented on appeal, we affirm except as to the calculation of prejudgment interest.

## I.

The heart of this matter is the non-compete agreement Perceptron secured from SAMI in July 1990, as part of a transaction to purchase certain intangible assets from Diffracto Ltd. Diffracto was founded in 1973 by Tim Pryor and others to develop laser beam technology for use in measuring and checking machined parts. Perceptron was founded in 1981 by Dwight Carlson and began developing laser beam sensors for use in sheet metal applications. In 1985, Diffracto received an infusion of capital from General Motors Corporation to develop competing electro-optical measuring devices for sheet metal applications. Diffracto developed its "Z-sensor," which was used in systems supplied to automobile companies in competition with Perceptron's products. At that time, both Perceptron and Diffracto used the technology in large end-of-line systems. The competition caused both of them to experience financial difficulty. A merger was discussed in early 1988, but the talks failed to result in an agreement.

Pryor formed SAMI in mid-1988 and described it as a "spin off" or "sister" company of Diffracto. Although Pryor left Diffracto, he had been its most prolific inventor and continued to be its largest single shareholder. In return for a capital investment, Diffracto received a 40-percent ownership interest in SAMI. Pryor owned the remaining 60 percent. SAMI had a license with an option to purchase certain Diffracto technology, which was part of the later purchase by Perceptron.

When Diffracto began looking for a buyer in 1989, negotiations resumed with Perceptron. Perceptron and Diffracto entered into a Sales Agreement in May 1990, which

closed in escrow pending completion of other matters including the non-compete agreement with SAMI and Pryor. The Sales Agreement provided:

> WHEREAS, the Seller [Diffracto] desires to sell to the Buyer [Perceptron] certain assets described in this Agreement which are used in the Fit Division of [Diffracto's] business to design, develop, manufacture, sell and service electro-optical measuring products used to determine the dimensional characteristics of, or the location of, formed (not machined) parts or assemblies (the "Fit Products") upon the terms and conditions contained in this Agreement;
>
> . . . .
>
> Seller shall . . . (a) sell, transfer and deliver to the Buyer . . . all the Seller's right, title and interest in the tangible assets described or listed in Schedule 6.4 hereof and in its then existing tangible and intangible assets *necessary for Buyer [Perceptron] to conduct . . . the business of designing, manufacturing, selling and servicing Fit Products . . . .*

(Emphasis added). The assets Perceptron purchased included: ownership of one patent and a fully paid perpetual license to use 54 other patents; operation and maintenance manuals; documentation for Diffracto system controllers, image processors, and sensors for in-line inspection systems; and information concerning Diffracto's customers and installed sheet metal systems, including customer contacts and the project managers' working files. Diffracto received over $2.5 million in notes and about 17 percent of Perceptron's outstanding stock. Separate non-competition agreements were executed by key Diffracto officers.[1]

---

[1] The Sales Agreement also included restrictive covenants by which Diffracto agreed not to compete in the Fit Business, and Perceptron agreed not to compete in the Finish Business for a five-year period. The

the Court, compensated the plaintiff for the losses that it incurred because of the breaches alleged.

Perceptron contends that it was and will continue to be irreparably harmed beyond the monetary damages awarded. Perceptron emphasizes the provision in the non-compete agreement itself, which states that any violation or threatened violation of the agreement "will cause irreparable injury," the remedy at law "shall be inadequate," and "Perceptron shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages." This language would carry greater significance if we were reviewing the denial of a motion for preliminary injunction.

Relying upon the extended nature of SAMI's breach, Perceptron also argues that the loss of goodwill and the opportunity to capitalize on that goodwill were impossible to measure. Perceptron specifically argued that between 1993 and 1995 SAMI built consumer relationships and a product reputation for SmartProx, which SAMI was not free to do until after the non-compete agreement expired in July 1995. The bulk of the damages that Perceptron sought for jobs it lost to SAMI, however, were for jobs that were not quoted until after the expiration of the non-compete agreement. Perceptron has failed to demonstrate, and we cannot conclude, that the district court's finding of no irreparable injury was clearly erroneous. Nor has Perceptron shown an abuse of discretion in the district court's conclusion that, on the merits, this case did not present appropriate circumstances for an injunction reinstating and extending SAMI's non-compete agreement.[8]

---

[8] SAMI argues that such relief should be barred by latches in this case because equity does not aid those who slumber on their rights. *See MedX, Inc. v. Ranger*, 788 F. Supp. 288, 294 (E.D. La. 1992). While it would be relevant that Perceptron did not file suit until nearly a year after the non-compete agreement had expired, we need not decide whether it could be a complete bar in this case.

flouted the terms of a noncompetition agreement, the court should be able to fashion appropriate equitable relief despite the fact that the parties did not expressly provide for such relief in their agreement. Furthermore, as courts allowing extensions of the terms of noncompetition agreements have found, it may not be possible to determine monetary damages with any degree of certainty. Where this is the case, the breaching party should not be rewarded because the agreement has already expired.

*Id.* (citation omitted). This court has observed that: "The loss of customer goodwill often amounts to irreparable injury because the damages flowing from such losses are difficult to compute. Similarly, the loss of fair competition that results from the breach of a non-competition covenant is likely to irreparably harm an employer." *Basicomputer Corp. v. Scott,* 973 F.2d 507, 512 (6th Cir. 1992) (citation omitted) (preliminary injunction entered in employment context).

Perceptron requested a 27-month injunction to further remedy SAMI's breach of the non-compete agreement during the period between March 1993, when SAMI began developing SmartProx, and July 1995, when the non-compete agreement expired. The district court denied the motion, stating:

> It appears that the Court is constrained to deny the motion for all of the reasons briefed and argued by the defense here.

> And I also must say that it doesn't appear that it would be appropriate for this Court to attempt to apply the standards of preliminary injunctive relief to an injunction requested at this point after plaintiff has been, I would have thought, made whole by damages.

> And I don't see that I could find irreparable harm, inasmuch as the jury has quite adequately, it appears to

As part of the deal, Perceptron insisted upon and negotiated a non-compete agreement with SAMI and Pryor. In exchange, SAMI received a $180,000 reduction in the option purchase price for the Diffracto technology it had licensed, as well as the right to buy back SAMI shares owned by Diffracto. The relevant portion of the Pryor/SAMI non-compete agreement, dated July 13, 1990, provided that:

> Without the prior written consent of Perceptron, neither Pryor nor SAMI shall, *directly or indirectly*, for a period of sixty (60) months from the date hereof and anywhere in the world, compete with Perceptron *in the business of designing, developing, manufacturing, selling and servicing electro-optical measuring products used: (i) to gage car bodies*, truck bodies, white goods, furniture *or major subassemblies of any of the foregoing*; or (ii) in the product applications known as "wheel alignment" or "bin picking". Without the prior written consent of Perceptron, neither Pryor nor SAMI shall, *directly or indirectly*, for a period of thirty-six (36) months from the date hereof and anywhere in the world, compete with Perceptron *in the business of manufacturing, selling and servicing electro-optical measuring products used to locate car bodies*, truck bodies, white goods, furniture *or major subassemblies of any of the foregoing*.

(Emphasis added). The agreement explicitly stated that the parties considered the restrictions to be fair and reasonable.

---

"Finish Business" was defined to be the business of the design, manufacture, sale and servicing of non-contact measurement equipment utilized by customers in detecting and eliminating surface defects in the finish of formed parts. SAMI argues that Perceptron's agreement had nothing to do with the protection of the assets purchased from Diffracto and characterizes these reciprocal covenants to be a division of the market and the elimination of competition. It was SAMI's separate non-compete agreement, however, that Perceptron claimed SAMI breached and SAMI challenged as a violation of antitrust law.

Considerable testimony was adduced at trial concerning the scope of this non-compete agreement and whether it was a reasonable restraint on competition as a legitimate part of the purchase of the Diffracto assets.

Until 1993, SAMI focused its efforts on small sensors for machined parts, robot guidance concepts, and new machine tools. By late 1992, however, SAMI was in serious financial trouble and shifted its focus. By April 1993, SAMI began developing its SmartProx sensors and components for use in gaging sheet metal parts and assemblies. SAMI publicly introduced the SmartProx system in September 1993, and began marketing it through brochures, demonstrations, and test installations. The SmartProx system was designed to be installed "upstream" in the assembly process and was marketed as an alternative to end-line sensor systems like those sold by Perceptron. Perceptron objected and expressed its belief that SAMI and Pryor had violated the non-compete agreement by using SmartProx sensors in systems for gaging automobile assemblies.[2]

Perceptron wrote a letter to Chrysler Corporation and communicated to other customers concerning its purchase of Diffracto's business and the non-compete agreements with Diffracto, SAMI, and Pryor. SAMI believed that Perceptron misrepresented the non-compete agreement and sent Chrysler an extensive response stating its position. SAMI claimed that the misrepresentations and threats of litigation caused delays in SmartProx orders. This was the basis of SAMI's tortious interference claim.

Perceptron filed suit in June 1996, almost a year after the non-compete agreement had expired in July 1995. Perceptron sued Diffracto, SAMI, and Pryor, but later voluntarily dismissed Diffracto and any claim that the non-compete

---

[2]Carlson conceded at trial that SAMI could have used the SmartProx sensors in other applications that would not have violated the non-compete agreement.

SAMI maintained that Perceptron unethically and fraudulently misrepresented the scope of the non-compete agreement in its letter to Chrysler and in contacts with other customers. Conceding ambiguity in the letter, Perceptron's witnesses testified that the letter was not intended to mislead, but, rather, to assure customers that it would continue to service the installed Diffracto sensors under the purchase and non-compete agreements. Although SAMI promptly responded with a thorough memorandum setting forth its view of the non-compete agreement, SAMI claimed that Chrysler and General Motors delayed or did not purchase its SmartProx system because of the misrepresentations. The jury found that SAMI violated the non-compete agreement and could reasonably have found that Perceptron did not fraudulently or unethically interfere with SAMI's business expectancies.

### B.  Perceptron's Motion for Equitable Extension of the Agreement

We review the district court's grant or denial of injunctive relief for an abuse of discretion. *See In re Dublin Sec., Inc.,* 133 F.3d 377, 380 (6th Cir. 1997), *cert. denied*, 525 U.S. 812 (1998). A district court abuses its discretion when it relies upon clearly erroneous findings or when it improperly applies the law. *See CSX Transp., Inc. v. Tennessee State Bd. of Equalization,* 964 F.2d 548, 553 (6th Cir. 1992). The Michigan Court of Appeals has held "that, in appropriate circumstances, the term of a noncompetition agreement may be extended beyond its stated expiration date." *Thermatool Corp. v. Borzym,* 575 N.W.2d 334, 338 (Mich. App. 1998).

Specific performance of an agreement may be an appropriate remedy where enforcement of the promise is necessary to avoid injustice. In cases where a party has

---

resulted in injury to the plaintiff. *See Monette v. AM-7-7 Baking Co.,* 929 F.2d 276, 280 (6th Cir. 1991).

## 2.    New Trial

For many of the same reasons discussed above, SAMI argued in the alternative that the verdict was against the weight of the evidence. We review the decision to deny a motion for new trial under the abuse of discretion standard. *See Gafford v. General Elec. Co.,* 997 F.2d 150, 171 (6th Cir.1993). In reviewing the denial of a new trial brought on the grounds that the verdict was against the clear weight of the evidence, we accept the verdict if it was reasonably reached. *See Ridgway,* 114 F.3d at 98.

Certainly, there was conflicting evidence presented concerning whether the non-compete agreement was ancillary to the transaction and a reasonable restriction on competition. Having reviewed the evidence, however, we conclude that the jury's verdict was reasonably reached, and that the district court did not abuse its discretion by denying SAMI's motion for new trial on the breach of contract claim. With respect to the antitrust claim, SAMI acknowledges that the motion for new trial was dependent upon the breach of contract claim. Since we affirm the denial of the renewed motion for judgment as a matter of law, or for new trial, with respect to the breach of contract claim, we affirm the decision with respect to SAMI's antitrust claim as well.

Nonetheless, SAMI continues to seek a new trial on its claim for tortious interference with business relationships. Under Michigan law, the interference with a business relationship "must be improper in addition to being intentional. Improper means illegal, unethical, or fraudulent." *Michigan Podiatric Med. Ass'n v. National Foot Care Program, Inc.,* 438 N.W.2d 349, 355 (Mich. App. 1989).[7]

---

[7]The elements of this claim are: (1) the existence of a valid business relation or expectancy; (2) that the defendant knew of the relationship or expectancy; (3) that the defendant intentionally interfered by improperly inducing or causing a breach or termination of the relationship or expectancy; and (4) that defendant's improper or unjustified interference

clause was breached through the use of the Z-sensor technology. SAMI raised several defenses and asserted counterclaims against Perceptron alleging that the non-compete agreement violated antitrust law and that Perceptron had tortiously interfered with its business relationships or expectancies concerning the SmartProx system. Trial began October 20, 1998, and continued through December 10, 1998. The jury returned a special verdict addressing the claims and counterclaims, beginning with the following questions and answers:

1. Did Perceptron establish by a preponderance of the evidence that the Agreement Not to Compete among Perceptron, SAMI and Dr. Pryor ("Agreement Not to Compete") was reasonable, enforceable (including permitted under the antitrust laws.)?
   Answer: <u>YES</u> (yes or no)
   If your answer is "no", go to Question 8; otherwise go to Question 2.

2. If your answer to Question 1 is "yes", did Perceptron establish by a preponderance of the evidence that SAMI breached the Agreement Not to Compete?
   Answer: <u>YES</u> (yes or no)

The jury further found that Perceptron suffered damages as a proximate and foreseeable result of SAMI's breach, and not as a result of Perceptron's own failure to mitigate its damages. The jury then awarded Perceptron a lump sum of $732,223.19 on its claim against SAMI. The jury also found no separate breach of contract by Pryor. Consistent with its decision on the breach of contract claim, the jury also found SAMI had failed to prove either (1) that the non-compete agreement constituted an unreasonable restraint of trade in violation of federal and state antitrust laws, or (2) that Perceptron improperly interfered with SAMI's business relationships with customers or prospective customers. The district court entered judgment in accordance with the special verdict on December 30, 1998.

In its post-trial motions, Perceptron moved for prejudgment interest from the date the complaint was filed and for an equitable extension of the SAMI non-compete agreement. SAMI moved for judgment as a matter of law or, in the alternative, for a new trial on both the breach of contract claim and its counterclaims. SAMI argued, as it does on appeal, that there was no basis to conclude that the non-compete agreement was a reasonable restraint consistent with antitrust law. The district court heard oral argument concerning these motions and, for the reasons stated on the record, denied SAMI's motion, denied Perceptron's request for an extension of the agreement, and granted in part the request for prejudgment interest. An amended judgment was entered on May 17, 1999. Both SAMI and Perceptron appeal.

product line because it would have been inefficient to keep separate product lines. Relying upon Perceptron's accounting treatment of the acquired assets, SAMI also argued that Perceptron actually abandoned the Diffracto technology. In response, Perceptron offered evidence that the intangible assets were only written off to conservatively represent the value of the company and the likelihood that those assets would generate future income. The accounting treatment of the book value of the assets raised an issue of fact concerning Perceptron's use of the assets. Although SAMI argued that any justification for the non-compete agreement ceased to exist when Perceptron abandoned the manufacture and sale of Diffracto's Z-sensors, reasonable minds could differ in that regard.

Finally, SAMI contends that the non-compete agreement was not of a reasonable duration. The durational scope of a covenant not to compete must be reasonably calculated to protect the legitimate interest of the purchaser in what it has purchased. *See Verson,* 723 F. Supp. at 11. That determination may include whether the agreed period was reasonably necessary for the purchaser to establish itself as a full-fledged market participant, as well as the time required to reverse engineer the technology in question. *See id.* at 10-11. While there was evidence that it would take less than two years to develop a product "from scratch" to compete with Perceptron's sensors, there was also testimony that the five-year restriction was reasonable in light of the tooling and selling cycles in the automotive industry. Reasonable minds could differ about whether five years was reasonably calculated to protect Perceptron's ability to realize the benefit of the transaction.

was driving them both out of business. Such motivation alone does not make the non-compete agreement an unreasonable restraint on competition. "Legitimate reasons exist to uphold noncompetition covenants even though by nature they necessarily restrain trade to some degree. The recognized benefits of reasonably enforced noncompetition covenants are by now beyond question." *Lektro-Vend,* 660 F.2d at 265.

SAMI argues that the non-compete agreement was not ancillary to the transaction because Perceptron purchased nothing more than the Z-sensor technology, which was not used in the SmartProx system. There was evidence, however, that could lead reasonable minds to conclude that Perceptron purchased Diffracto's customer base and goodwill in the fit business. Perceptron purchased the right to service Diffracto sensors and deal with Diffracto's customers in an effort to make Diffracto's goodwill its own. SAMI disputed whether goodwill was part of the transaction since it was not listed among the assets in the Sales Agreement. The case SAMI relies upon, however, actually found that the fact that relevant financial documents did not reflect the transfer of goodwill was not particularly probative. *See Verson Wilkins Ltd. v. Allied Prods. Corp.,* 723 F. Supp. 1, 8 (N.D. Ill. 1989). Rather, it is the totality of the circumstances which determines whether goodwill was a component of the transaction. *See id.*

SAMI also argues that there could be no transfer of goodwill because Perceptron did not purchase the manufacturing facilities, equipment, or inventory to continue Diffracto's business as a "going concern." While Perceptron did not manufacture any Diffracto Z-sensors or sell any new installations with Z-sensors, it purchased the tangible and intangible assets necessary to conduct Diffracto's fit business; it provided service to Diffracto's installed base of customers; and it cultivated relationships through the servicing of the Diffracto equipment. There was also testimony that Perceptron incorporated Diffracto's technology into its own

## II.

### A. SAMI's Motion for Judgment as a Matter of Law or for a New Trial[3]

#### 1. Judgment as a Matter of Law[4]

We review the district court's decision on a motion for judgment as a matter of law *de novo* and use the same standards as the district court. *See K&T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir. 1996). In diversity cases, the denial of a motion for judgment as a matter of law based upon the sufficiency of the evidence is governed by the law of the forum state. *See Ridgway v. Ford Dealer Computer Servs., Inc.,* 114 F.3d 94, 97 (6th Cir. 1997).[5] Under Michigan law, which is nearly identical to the federal standard, "a judgment as a matter of law 'may not be granted

---

[3]Perceptron opposed SAMI's post-trial motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) on the grounds that it was procedurally waived by SAMI's failure to make a motion for judgment as a matter of law "at the close of all the evidence." *See Jackson v. City of Cookeville*, 31 F.3d 1354, 1358 (6th Cir. 1994). Technical deviation from the requirement that a motion be made at the close of all the evidence is not fatal, however, when the purpose for the requirement has been served. *See Riverview Investments, Inc. v. Ottawa Comm. Improvement Corp.,* 899 F.2d 474, 477 (6th Cir. 1990); *Boynton v. TRW, Inc.,* 858 F.2d 1178, 1185-86 (6th Cir. 1988) (en banc). We find, as did the district court, that the purpose of Rule 50(b)'s requirement was served in this case. The district court considered the motion at the close of the relevant proofs and the rebuttal witness's testimony was brief and inconsequential to the issue. *See Riverview*, 899 F.2d at 477.

[4]SAMI titled the motion as one for judgment notwithstanding the verdict, but that is the same as the Rule 50(b) motion now termed a motion for judgment as a matter of law. *See Jackson* 31 F.3d at 1357.

[5]The panel in *Ridgway* questioned the validity of applying the forum state's standards in this context. Noting that the federal and Michigan standards are nearly identical and that one panel cannot overrule another, the rule was nonetheless applied. *See Ridgway,* 114 F.3d at 97 n.3.

unless reasonable minds could not differ as to the conclusions to be drawn from the evidence.'" *Id.* (quoting *Toth v. Yoder Co.,* 749 F.2d 1190, 1194 (6th Cir. 1984)). In evaluating the sufficiency of the evidence, we must examine the evidence and take all legitimate inferences in the light most favorable to the non-moving party. *See Matras v. Amoco Oil Co.,* 385 N.W.2d 586, 588 (Mich. 1986); *Meagher v. Wayne State Univ.,* 565 N.W.2d 401, 409 (Mich. App. 1997).

SAMI did not and does not contest the jury's finding that SAMI violated the non-compete agreement. Rather, SAMI argues that there was no basis for the jury to conclude that the non-compete agreement was a valid and reasonable restraint on competition under federal and state antitrust laws. To establish the alleged antitrust violation, SAMI was required to show a contract, combination, or conspiracy that affected interstate commerce and unreasonably restrained trade. *See Lie v. St. Joseph Hosp.,* 964 F.2d 567, 568 (6th Cir. 1992).[6] The parties agree that "the legality of noncompetition covenants ancillary to a legitimate transaction must be analyzed under the rule of reason." *Lektro-Vend Corp. v. Vendo Co.,* 660 F.2d 255, 265 (7th Cir. 1981).

> [C]ovenants not to compete are valid if (1) ancillary to the main business purpose of a lawful contract, and (2) necessary to protect the covenantee's legitimate property interests, which require that the covenants be as limited as is reasonable to protect the covenantee's interests. *United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 281-82 (6th Cir. 1898), *aff'd as modified,* 175 U.S. 211 [] (1899).

*Id.* The Supreme Court explained that: "As its name suggests, the rule of reason requires the factfinder to decide

---

[6]The Michigan Antitrust Reform Act, Mich. Comp. Laws Ann. § 445.772 (West 1989), adopted language from and is interpreted consistent with the Sherman Act, 15 U.S.C. § 1. *See Compton v. Joseph Lepak, D.D.S., P.C.,* 397 N.W.2d 311 (Mich. App. 1986).

whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition." *Arizona v. Maricopa County Med. Soc'y,* 457 U.S. 332, 343 (1982).

In this case, the jury heard 25 days of testimony and the parties' competing views concerning the scope and reasonableness of SAMI's non-compete agreement. The jury also was instructed concerning the considerations relevant to that determination. SAMI claims no error in the admission of evidence or the instructions to the jury. We are convinced that when the evidence and reasonable inferences are taken in the light most favorable to Perceptron, reasonable minds could differ about whether the non-compete agreement was ancillary to the transaction and a reasonable restraint on competition. Accordingly, the district court properly denied SAMI's renewed motion for judgment as a matter of law.

There was evidence that Pryor, who continued to be a member of Diffracto's Board and its largest single shareholder, formed SAMI to develop sensors, other than Z-sensors, for applications that did not compete with Perceptron. Yet, Pryor was a prolific inventor in the field of electro-optical devices and was listed as the inventor on all but one of the patents conveyed or licensed to Perceptron. Pryor, as a founder of Diffracto, had prior relationships with Diffracto's customers and marketed SAMI as a "spin off" or "sister company" of Diffracto. Perceptron insisted upon securing a non-compete agreement with SAMI and Pryor to protect the value of its purchase. Perceptron offered the testimony of an expert witness concerning the need for the non-compete agreement; the value of the goodwill acquired; and the reasonableness of the duration, geographic reach, and product scope of the non-compete agreement. We turn to the specific arguments put forth by SAMI.

SAMI emphasizes that Perceptron was motivated to consummate the purchase from Diffracto in order to buy back the market in the fit business and escape the competition that